1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Manatt, Phelps & Phillips, LLP
BRAD W. SEILING (Bar No. CA 143515)
E-mail: bseiling@manatt.com
CHAD S. HUMMEL (Bar No. CA 139055)
E-mail: chummel@manatt.com
ERIN C. WITKOW (Bar No. CA 216994)
E-mail: ewitkow@manatt.com
11355 West Olympic Boulevard
Los Angeles, CA 90064-1614
Telephone: (310) 312-4000
Facsimile: (310) 312-4224

*Attorneys for Defendant*
YOUR BABY CAN, LLC



FILED
CLERK, U.S. DISTRICT COURT

FEB 1 6 2011

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

F. BETH GASNER, on Behalf of
Herself and All Others Similarly
Situated,

Plaintiff,

vs.

YOUR BABY CAN, LLC, ROBERT
TITZER, Ph.D.,

Defendants.

No. **CV11- 01434**CAS(MAN)

**NOTICE OF REMOVAL OF CIVIL
ACTION TO UNITED STATES
DISTRICT COURT UNDER 28
U.S.C. §§ 1441 AND 1446**

[Filed concurrently with:
(1) Certification and Notice of
     Interested Parties;
(2) Civil Case Cover Sheet;
(3) Notice to Adverse Parties]

Defendant Your Baby Can, LLC ("YBC") hereby gives notice that it is

removing the captioned case, originally filed in the Superior Court of the State of

California for Los Angeles County, Case No. BC452137, to the United States

District Court for the Central District of California.  YBC removes the case

pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, on the grounds set forth below.

1.     On December 29, 2010, plaintiff F. Beth Gasner ("Gasner"), acting

individually and on behalf of a putative class of supposedly similarly situated

persons she seeks to represent, filed this action in Los Angeles County Superior

Court.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

NOTICE OF REMOVAL OF CIVIL ACTION

2.     On or about February 7, 2011, service of the summons and complaint was effected on Defendant Your Baby Can, LLC ("YBC") through the execution by YBC's counsel of a Notice and Acknowledgment of Receipt pursuant to Section 415.30 of the California Code of Civil Procedure.  Removal of this action is therefore timely, in that YBC has filed the notice of removal within 30 days of service of the summons and complaint. *See* 28 U.S.C. § 1446(b).  The undersigned counsel of record certifies that Defendant Robert Titzer, Ph.D. ("Titzer") consents to the removal of this action.

3.     According to the docket for the Los Angeles County Superior Court for this action, the complaint, civil case cover sheet, notice of related case, notice of case management conference, Order to Show Cause for Failure to File Proof of Service, and answers of YBC and Titzer constitute all process, pleadings, papers and orders filed in Los Angeles County Superior Court in this action within the meaning of 28 U.S.C. § 1446(a).  Copies of those documents received by YBC are attached hereto as Exhibit A.

4.     The removal of this action terminates all proceedings in Los Angeles County Superior Court. *See* 28 U.S.C. § 1446(d).

5.     YBC removes this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. 1332(d), and 28 U.S.C. § 1453, on the grounds that (a) this action is a proposed "class action" as defined in 28 U.S.C. § 1332(d)(1)(B); (b) Plaintiff seeks to represent a putative class of consumers throughout the United States, including residents of states other than the State of California, which Plaintiff alleges consists of hundreds of thousands of persons, and (c) the alleged amount in controversy exceeds $5,000,000, exclusive of interest and attorneys' fees.

**Proposed Class Action**

6.     Plaintiff alleges that this case is brought as a class action.  Plaintiff seeks to certify a class that consists of all persons who purchased the Your Baby

1   Can Read! Early Language Development System ("YBCR") from December 2006

2   through the date on which notice of this action is provided to potential class

3   members. Complaint, ¶ 43 (Ex. A). Plaintiff alleges that approximately one

4   million consumers have purchased YBCR, and "thousands of purchasers [of

5   YBCR] exist . . . ." Complaint, ¶¶ 5, 45. Plaintiff seeks an award of injunctive

6   relief in favor of Plaintiff and the other "Class" members, as well as the return of all

7   amounts paid by these persons for YBCR. Complaint, ¶¶ 61, 73, 79, 87, 93, 97, B-

8   F. Therefore, this action is a proposed "class action" under 28 U.S.C.

9   § 1332(d)(1)(B), defined as "any civil action filed under Rule 23 of the Federal

10  Rules of Civil Procedure or similar State statute or rule of judicial procedure

11  authorizing an action to be brought by 1 or more representative persons as a class

12  action." In accordance with 28 U.S.C. § 1332(d)(5)(B), the number of members of

13  the proposed plaintiff class in the aggregate is more than 100, based on the

14  allegations in the Complaint.

15                              **Minimal Diversity**

16          7.      Under 28 U.S.C. § 1332(d)(2)(A), a district court may assert

17  jurisdiction over a class action in which "any member of a class of plaintiffs is a

18  citizen of a State different from any defendant." Such minimal diversity exists

19  among the parties in this case. Plaintiff alleges that she is a citizen of the State of

20  New York, and YBC and Titzer are citizens of the State of California. Complaint

21  ¶¶ 12-14. Plaintiff also alleges that Defendants marketed YBCR through its

22  website and a "ubiquitous marketing campaign consisting of persuasive television

23  and radio infomercials and public appearances by defendant Dr. Titzer."

24  Complaint ¶¶ 2, 19, 25-27. Furthermore, Plaintiff alleges YBC "markets,

25  advertises, and sells its Can Read Systems to parents and other consumers

26  nationwide." *Id.* at ¶ 13. Plaintiff seeks to represent a class that consists of "all

27  individuals who purchased or acquired any of the Can Ready Systems from

28  December 2006 through the date on which notice of this action is provided to

1  [proposed] Class Members " (*id.*, ¶ 43), which necessarily includes persons

2  throughout the United States in light of Plaintiff's allegation regarding Defendants'

3  nationwide marketing of YBCR.  In addition, Plaintiff alleges that the proposed

4  "Class" is "geographically dispersed."  Complaint, ¶ 45.  Because at least one

5  member of the proposed "Class" is a citizen of a State different from Defendants,

6  there is sufficient diversity among the parties to satisfy the requirement of minimal

7  diversity under 28 U.S.C. § 1332(d)(2)(A).

8  **Amount in Controversy**

9       8.     This is an "action in which the matter in controversy exceeds the sum

10  or value of $5,000,000." 28 U.S.C. § 1332(d)(2).  "In any class action, the claims

11  of the individual class members shall be aggregated to determine whether the

12  matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest

13  and costs."  28 U.S.C. § 1332(d)(6).

14       9.     Plaintiff seeks an order compelling Defendant to return all amounts

15  paid to it by consumers of YBCR.  Complaint ¶ 61.  Plaintiff alleges that the

16  purchase price for YBCR ranges from $99.95 to $214.90 per product.  *Id.* ¶ 16.

17  Plaintiff also alleges that Defendants have generated $90 million in annual revenue

18  in connection with the sale of Your Baby Can Read! products.  *Id.* ¶ 5.  Based on

19  the allegations in the Complaint, this case easily meets the $5 million amount in

20  controversy threshold for CAFA jurisdiction.  YBC denies the allegations in the

21  Complaint, and denies that Plaintiff or any putative class will be able to recover any

22  damages or restitution.  But Plaintiff's allegations establish that she seeks to

23  recover more than $5 million in restitution.

24       10.    Plaintiff also seeks injunctive relief in the form of an order enjoining

25  Defendants from continuing to sell YBCR and pursuing the policies, acts and

26  practices alleged in the Complaint, as well as requiring Defendants to undertake a

27  "corrective advertising campaign."  Complaint, ¶¶ B, C.  The value of the

28  injunctive relief sought must also be considered in determining the amount in

1    controversy. *Cohn v. Petsmart, Inc.,* 281 F.3d 837, (9th Cir. 2002) (the court solely

2    looked to the value of the injunctive relief sought to determine the amount in

3    controversy in affirming removal).

4        11.   In sum, the alleged aggregated monetary relief, injunctive relief and

5    fees that Plaintiff seeks exceed the $5,000,000 amount in controversy required to

6    establish federal jurisdiction under CAFA.

7                              **Removal is Proper**

8        12.   Pursuant to 28 U.S.C. § 1453, a suit over which a district court would

9    have original jurisdiction under CAFA may be removed to federal court from state

10   court, as provided by 28 U.S.C. § 1441(a).  Therefore, YBC is entitled to remove

11   the instant action to this Court, because the Court could have asserted original

12   jurisdiction over the case.

13       13.   Los Angeles County Superior Court lies within the Central District of

14   California.  Accordingly, removal to this district is proper. *See* 28 U.S.C.

15   § 1441(a).

16       14.   Written notice of the filing of this Notice of Removal and the removal

17   of the state court action is being delivered to Plaintiff through her counsel of record.

18   A copy of this Notice of Removal will be filed promptly with the Clerk of the Los

19   Angeles County Superior Court, as required by 28 U.S.C. § 1446(d).  YBC attaches

20   as Exhibit B to this Notice a copy of the notice to be filed with the state court

21   (absent its exhibits).

22       15.   Plaintiff alleges that the parties "submit to the jurisdiction of [Los

23   Angeles County Superior Court]" based on a forum selection clause on YBC's

24   website, which applies to any action to "enforce or interpret" the website's terms

25   and conditions.  Complaint ¶ 8 and Exh. 9.  Contrary to Plaintiff's allegations, this

26   narrow forum selection clause does not apply to this action and, therefore, does not

27   preclude removal of the action to this Court.  First, Plaintiff's claims arise out of the

28   central allegation that YBC's advertising and marketing claims are false and

1   misleading (Complaint ¶¶ 1-7), and such claims have nothing to do with the

2   enforcement or interpretation of the YBC website's terms and conditions.

3   Accordingly, the forum selection clause set forth in the terms and conditions is

4   inapplicable to this action.  Second, on information and belief, Plaintiff purchased

5   YBCR at a retail store, not through the YBC website.  Plaintiff does not allege that

6   she has ever even seen, much less agreed to be bound by, the website's terms and

7   conditions.  Plaintiff cannot seek to enforce the terms of a contract to which

8   Plaintiff has never assented.

9          WHEREFORE, YBC respectfully gives notice that the above-entitled action

10  is removed from the Los Angeles County Superior Court to the United States

11  District Court for the Central District of California.

12

13  Dated:     February 16, 2011            MANATT, PHELPS & PHILLIPS, LLP
                                            BRAD W. SEILING
14                                          CHAD S. HUMMEL
                                            ERIN C. WITKOW
15

16                                          By: _____
                                               Erin C. Witkow
17                                             *Attorneys for Defendant*
                                             YOUR BABY CAN, LLC
18

19

20  300213106.1

21

22

23

24

25

26

27

28

# EXHIBIT A

**ORIGINAL**

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

Your Baby Can, LLC and Robert Titzer, Ph.D.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

F. Beth Gasner, on Behalf of Herself and All Others Similarly
Situated

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**FILED**
Los Angeles Superior Court

DEC 29 2010

JOHN A. CLARKE, CLERK

BY DAWN ALEXANDER, DEPUTY

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is: *(El nombre y dirección de la corte es):* | CASE NUMBER: *(Número del Caso):* **BC452137** |

Superior Court of California, County of Los Angeles
Stanley Mosk Courthouse
111 North Hill St., Los Angeles, CA 90012

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Rachel L. Jensen, Robbins Geller Rudman & Dowd LLP, 655 West Broadway, Suite 1900,
San Diego, CA 92101; ph. 619/231-1058.

| DATE: *(Fecha)* December 29, 2010 | JOHN A. CLARKE Clerk, by *(Secretario)* DAWN ALEXANDER | , Deputy *(Adjunto)* |
|---|---|---|

*(For proof of service of this summons use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*

   [ ] on behalf of *(specify):*

   under: [ ] CCP 416.10 (corporation)   [ ] CCP 416.60 (minor)
   [ ] CCP 416.20 (defunct corporation)   [ ] CCP 416.70 (conservatee)
   [ ] CCP 416.40 (association or partnership)   [ ] CCP 416.90 (authorized person)

   [ ] other *(specify):*
4. [ ] by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use Judicial Council of California SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465 www.courtinfo.ca.gov |
|---|---|---|

Exhibit **A** Page **7**





Exhibit __A__ Page __8__

COPY

1   ROBBINS GELLER RUDMAN
    & DOWD LLP
2   RACHEL L. JENSEN (211456)
    655 West Broadway, Suite 1900
3   San Diego, CA  92101
    Telephone: 619/231-1058
4   619/231-7423 (fax)

5   ROBBINS GELLER RUDMAN
    & DOWD LLP
6   SAMUEL H. RUDMAN
    ROBERT M. ROTHMAN
7   MARK S. REICH
    EDWARD Y. KROUB
8   58 South Service Road, Suite 200
    Melville, NY  11747
9   Telephone: 631/367-7100
    631/367-1173 (fax)

10

11  Attorneys for Plaintiff

12              SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                      COUNTY OF LOS ANGELES

14
    F. BETH GASNER, On Behalf of Herself and  )   Case No.  BC452197
15  All Others Similarly Situated,             )
                                               )   CLASS ACTION COMPLAINT
16                            Plaintiff,        )
                                               )
17        vs.                                   )
                                               )
18  YOUR BABY CAN, LLC and ROBERT              )
    TITZER, Ph.D.,                              )
19                                              )
                              Defendants.       )   JURY TRIAL DEMANDED
20                                              )

21

22

23

24

25

26

27

28

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

DEC 29 2010

John A. Clarke, Executive Officer/Clerk
By _____ Deputy
    DAWN ALEXANDER

CLASS ACTION COMPLAINT

1    Plaintiff F. Beth Gasner ("plaintiff"), by her undersigned attorneys, Robbins Geller Rudman &

2   Dowd LLP, on behalf of herself and the Class (defined below), brings this action against defendant

3   Your Baby Can, LLC ("Your Baby") and defendant Dr. Robert C. Titzer, Ph.D. ("Dr. Titzer")

4   (collectively, "defendants") for compensatory damages and equitable, injunctive, and declaratory relief

5   against defendants. Plaintiff alleges the following upon information and belief, formed after an inquiry

6   reasonable under the circumstances, except as to those allegations which pertain to the named plaintiff

7   (which are alleged on personal knowledge), as follows:

8                               **NATURE OF THE ACTION**

9        1.    This action is brought on behalf of parents and other consumers who purchased infant

10   and toddler educational products based on defendants' false representations concerning the efficacy of

11   the Your Baby Can Read! products (the "Can Read System" (defined below) and "Predecessor Can

12   Read System" (defined below), collectively the "Can Read Systems") during the Class Period (defined

13   below). Specifically, defendants falsely represented to consumers that, *inter alia*, the Can Read

14   Systems could teach infants and children how to read at an extraordinarily young age. Defendants

15   further misrepresented that scientific trials were conducted to prove defendants' outlandish assertions.

16   In fact, the exact opposite was true, as many scientists and experts concluded that the Can Read

17   Systems were ineffective and worthless.

18       2.    Despite knowing that their products could not teach infants how to read, defendants

19   conducted a ubiquitous marketing campaign consisting of persuasive television and radio infomercials

20   and public appearances by defendant Dr. Titzer. In furtherance of their scheme, defendants knowingly

21   and/or recklessly disseminated the following false and misleading claims to vulnerable parents,

22   grandparents and other educators about the Can Read Systems:

23              (a)    that the products can teach a three month old baby to read by nine months old;

24              (b)    that the products can enable a five year old to read junior high school level

25   books;

26              (c)    that the products can teach infants suffering from Down's syndrome how to read;

27              (d)    that the products can teach an infant how to read at an early age and that this

28   would prevent learning disabilities, including dyslexia; and

1            (e)     that studies performed by the scientific community support the use of the Can

2    Read Systems.

3            3.     Defendants further issued false and misleading statements about the Can Read Systems

4    on its website, www.yourbabycanread.com, claiming that the products are "a remarkable learning

5    system which will have positive and permanent affects in your child's life," and that "with the Your

6    Baby Can Read!...you'll get a complete set of tools to unlock your child's reading potential."[1]

7            4.     As alleged herein, scientific evidence does not support defendants' contentions that the

8    Can Read Systems can effectively develop an infant's ability to read.  Scientific experts who have

9    tested the claims made by defendants have concluded that infants using the products are not reading;

10   rather, these infants are merely memorizing the shapes of the letters placed in front of them. According

11   to these doctors and scientific experts, no evidence exists that the Can Read Systems' rote memorization

12   process boosts an infant's ability to read and comprehend.

13           5.     Defendants $37 million false advertising campaign has persuaded approximately one

14   million consumers (including more than 400,000 direct consumers, 100,000 retail customers and

15   400,000 online consumers) to purchase their products.  Defendants have reaped over $90 million in

16   annual revenues by unjustly preying on the susceptibility of parents who sought to offer their children  a

17   brighter future at a young age.

18           6.     Despite defendants' actual knowledge of the inefficacy of their Can Read Systems,

19   defendants have failed to, *inter alia*, inform plaintiff and the Class that their products cannot

20   successfully teach an infant how to read. Defendants have also failed to inform the consuming public of

21   the dearth of scientific studies or evidence supporting the effectiveness of the products.  Finally,

22   defendants have failed to recall the Can Read Systems and/or reimburse consumers the entire purchase

23   price of these worthless products.  Instead of accurately portraying their products to consumers,

24   defendants continue to sell the Can Read Systems in stores, by phone order and on their website based

25   upon false and misleading advertising.

26   

27   [1]    Exhibit 1 (Dec. 28, 2010), http://www.yourbabycanread.com. All exhibits referenced herein are
     attached hereto.

28   

- 2 -

CLASS ACTION COMPLAINT

1        7.    This class action is brought against defendants for equitable (injunctive and/or

2    declaratory) relief, breach of contract, unjust enrichment and violations of California's Unfair

3    Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL"); the Consumer Legal Remedies

4    Act, Cal. Civ. Code §1750, *et seq.* ("CLRA"); the False Advertising Law, Cal. Bus & Prof. Code

5    §17500, *et seq.* ("FAL" or "17500"); Breach of Contract; Negligent Misrepresentation; and Unjust

6    Enrichment. Plaintiff seeks damages and equitable relief on behalf of the Class, which relief includes,

7    but is not limited to, the following: full refunds for plaintiff and the Class; an order enjoining defendants

8    from falsely marketing and advertising their products; costs and expenses, including attorneys' fees and

9    expert fees; and any additional relief that this Court determines to be necessary or appropriate to

10   provide complete relief to plaintiff and the Class.

11                                 JURISDICTION AND VENUE

12       8.    Pursuant to C.C.P. §410.10 and Cal. Bus. & Prof. Code §§17203 and 17204, defendants

13   are subject to the jurisdiction of the court of the State of California by virtue of their extensive business

14   dealings and transactions within this state. The misconduct alleged herein arose from and occurred in

15   California. Defendants are headquartered in, conduct business and/or reside in California and have

16   sufficient minimum contacts with California, or otherwise avail themselves of the consumer market in

17   California, through the marketing, promotion, and sale of their Can Read Systems so as to render

18   jurisdiction by the courts of California permissible and appropriate. Furthermore, the most recent Can

19   Read Systems' terms and conditions states that the parties submit to the jurisdiction of this Court. The

20   terms and conditions specifically state:

21           These Terms are governed by California laws. Any action to enforce or interpret them
            shall be brought and maintained exclusively in the Superior Court of the State of

22           California in Los Angeles. The parties irrevocably submit to the jurisdiction of said
            court and waive all objections thereto and waive the right to remove such action to a

23           Federal District Court.

24       9.    The California Superior Court has jurisdiction over this action pursuant to the California

25   Constitution, Article VI, §10, which grants the Superior Court original jurisdiction in all cases except

26   those given by statute to trial courts. The statute under which this action is brought does not grant

27   jurisdiction to any other trial court.

28

CLASS ACTION COMPLAINT

Exhibit ___A___ Page ___12___

10.     Venue is proper in this county pursuant to C.C.P. §§395 and 395.5 and Cal. Bus. & Prof. Code §17203 because defendants promote, market and sell the Can Read System to consumers who reside in this county. Furthermore, the most current Can Read Systems' terms and conditions state that all actions brought against Your Baby are to be adjudicated by this Court.

11.     Federal court subject matter jurisdiction over this action does not exist. Plaintiff asserts no federal question and/or violations of federal law in this Complaint. Plaintiff's individual claims do not exceed $75,000. In addition, the operative terms and conditions to the Can Read Systems states that defendants "waive the right to remove such action to a Federal District Court."

## PARTIES

12.     Plaintiff, F. Beth Gasner, a resident of the State of New York, purchased the Can Read Systems during the Class Period. Prior to purchasing her product, plaintiff had no indication or ability to discern that the product could not teach her infant child how to read. Had she been informed of the true nature of the product, she would not have purchased it.

13.     Defendant Your Baby Can, LLC is a company incorporated under the laws of the State of California. Defendant Your Baby's corporate headquarters are located at 1958 Kellogg Avenue, Carlsbad, California, 92008. Defendant Your Baby markets, advertises, and sells its Can Read Systems to parents and other consumers nationwide. Defendant Your Baby maintains an office in London and employs a workforce of about 30 people. Defendant Your Baby is seeking to expand its product line internationally and expects international sales to account for 15% of all revenues in 2010. The company is currently focusing its sales efforts on the following international markets: the United Kingdom, Japan, Korea, Spain, France, Portugal and Russia.

14.     Defendant Dr. Robert Titzer is the founder of Your Baby and resides in Bonsall, California. Defendant Titzer directly participated and participates in the management of Your Baby and by virtue of his position at Your Baby was and is able to control the various misstatements made to consumers during the Class Period. In fact, defendant Titzer himself made many of the misstatements alleged herein. Dr. Titzer has a Ph.D. in human performance, the study of physical motor skills. Dr. Titzer does not have a degree relating to child reading development or reading literacy. Dr. Titzer

- 4 -

Exhibit __A__ Page __13__

1  published an article unrelated to child literacy in the journal *Psychological Review*. Dr. Titzer's other

2  published materials are also unrelated to reading.

3                                    **THE FACTS**

4        15.    Defendant, Your Baby was formed by defendant Dr. Titzer in August of 2007.

5        16.    Many consumers have purchased the Can Read System distributed by defendants since

6  August of 2007 (the "Can Read System") from defendants' website, www.yourbabycanread.com, for

7  $199.95 (or $214.90 if paid in installments), others have called defendants' 1-800 number and ordered

8  the products via telephone. The Can Read System was also sold in stores for $99.95 (which does not

9  come with the deceptive 30 day money back "guarantee").

10       17.    Prior to 2007, defendant Dr. Titzer created predecessor or related products to the Can

11 Read System that incorporated the same multisensory approach (the "Predecessor Can Read System").

12 The Predecessor Can Read System was created by defendant Dr. Titzer in his home, using his own two

13 daughters as experimental subjects. Defendants made false and misleading representations regarding

14 the Predecessor Can Read System in a similar fashion to the misrepresentations they made regarding the

15 Can Read System.

16       18.    In 2007, Dr. Titzer began marketing the Can Read System by inaccurately describing the

17 scientific research surrounding infant reading.

18       19.    According to Your Baby's website, the Can Read System provides the following:

19 **What You Get**

20 Getting started is as easy as ABC. With the Your Baby Can Read! Deluxe Kit, you'll get
   a complete set of tools to unlock your child's reading potential.

21
22 *For your child*:

23 •**Your Baby Can Read! Complete 5-Level DVD Reading System**. These fun,
   interactive videos will keep your baby reading and entertained!

24 •**5 Sets of Sliding Words Cards**. The read & play cards accompany each level and
   reinforce what your child has learned.

25
26 •**5 Lift-a-Flap Books**. The word and picture books accompany each level and introduce
   familiar words from the DVDs in a new format.

27 *For you*:

28 **Baby's First Teacher Pack**. Contains everything you need to help your child succeed!

                          CLASS ACTION COMPLAINT

•**Parent's Guide.** Gives easy step-by-step instructions to the Your Baby Can Read! Program.

•**Early Learning Workshop DVD.** Dr. Titzer shares his secrets for a fun, multi-sensory approach to early language development.

•**Teaching Cards.** 15 Fun Games with 83 double-sided Interactive Cards to play with your child!

*See* Exhibit 1.

20.    The Can Read System states that it incorporates a multisensory technique to teach children how to read at a very young age. Dr. Titzer himself has briefly explained how this multisensory technique purportedly works – since there is more neuroplasticity (the ability of the brain to change or modify based on the environment) early in life, it is possible that the brain will develop more efficiently for reading, so the child could read as naturally as the child understands spoken language.

21.    The Can Read System contains a thirty minute video for parents to watch with their children. The video visually introduces sixteen new words to children and parents are instructed to replay the same thirty minute video once or twice a day for a consecutive one to two month period. During that period, parents are instructed to review the same sixteen words with their children, on flash cards, and to read their children certain books that utilize the same sixteen words. At the conclusion of the one to two month period, parents are instructed to continue the cycle by beginning a new set of sixteen words that are featured in the next set of videos, flash cards and books.

22.    BrillBaby.com editor Madeleine Fitzpatrick authored a booklet entitled "Everything You Need to Know To Teach Your Baby to Read," discussing the philosophy behind Dr. Titzer's multisensory method:

The multisensory method of teaching babies to read involves using books, DVDs, PowerPoint slideshows and/or computer software to illustrate the meanings of words through multiple sensory channels – visual, auditory, and kinesthetic (including doing, touching, smelling and tasting).

Delivering information through several sensory channels is a powerful teaching method because it is easier to remember something we have experienced in a number of ways. Like the flash card method, this type of teaching engages the right hemisphere of the brain (albeit in a different way). Unlike the left brain, which learns through logic and reasoning, the right brain learns through feeling, doing, and visualizing (pictures rather than words). This is why young children who are right brain dominant until the age of three and a half – instinctively try to touch and taste every object they come across.

- 6 -

CLASS ACTION COMPLAINT

1

### Philosophy

2   Parents naturally make use of multiple sensory stimuli to communicate with their
children — something as simple as saying, "That's your nose!" and touching your baby's
3   nose is multisensory teaching. Having heard the word "nose" and simultaneously felt
her nose touched, your child will be more likely to remember the word's meaning. Or,
4   you might sing Head, Shoulders, Knees And Toes to your child, while helping her touch
each part of her body in turn. Children learn body parts much more rapidly when taught
5   in this way than when they simply hear the words used in context.

6   No one understands the value of this type of learning better than infant researcher
Robert Titzer. After years spent studying how babies learn, Titzer decided to introduce
7   the written word to his first child, Aleka, in infancy. Having taught Aleka to read some
30 whole words by the age of 9 months, Titzer went on to develop Your Baby Can Read
8   (YBCR). The series uses pictures and videos to illustrate the meanings of words, and
encourages parents and babies to use their kinesthetic sense. This means, for example,
9   helping your child to touch his toes while he looks at the word "toes," or helping him to
raise his arms in the air while he looks at the words "arms up." Babies taught in this way
10  soon learn to perform the actions by themselves.

11  Exhibit 2.[2]

12      23.    In describing the multisensory approach, BrillBaby.com editor Madeleine Fitzpatrick

13  apparently took Dr. Titzer's method at face value, without conducting any independent research to

14  substantiate his claims about the efficacy of the Can Read Systems.

15      24.    Defendants further highlight the supposed benefits of the Can Read System through the

16  following explanation:

17  A baby's brain thrives on stimulation and develops at a phenomenal pace...nearly 90%
during the first five years of life! The best and easiest time to learn a language is during
18  the infant and toddler years . . . when the brain is creating thousands of synapses, or
connections, allowing a child to learn both the written word and spoken word
19  simultaneously.

20                          *          *          *

21

22

23

24

25

26  ────────────

27  [2]   (Dec. 28, 2010), http://www.brillbaby.com/teaching-baby/reading/the-multisensory-method.php.

28



**Human Brain Development**

Synapse Formation Dependant on Early Experiences

*     *     *

Remember, your child has tens of thousands of new brain connections forming every second. While watching Your Baby Can Read!, those connections now have even more value. Over time, these billions of powerful connections give your child the tools for increased communication, enhanced learning and overall confidence giving them the edge they'll need for a better education and career success.

Exhibit 1 (video on website).

25.    Despite knowing that their products could not teach infants how to read, defendants conducted a ubiquitous marketing campaign since the formation of Your Baby, consisting of television and radio infomercials and public appearances by defendant Dr. Titzer. In furtherance of their scheme, defendants knowingly and/or recklessly disseminated the following false and misleading claims to parents, grandparents and educators about the Can Read System, including, for example, the following:

    (a)    that the products can teach a three month old baby to read by nine months old;

    (b)    that the products can enable a five year old to read junior high school level books;

    (c)    that the products can teach infants suffering from Down's syndrome how to read;

    (d)    that the products can teach an infant how to read at an early age and that this would prevent learning disabilities, including dyslexia; and

    (e)    that studies performed by the scientific community support the use of the products.

26.    Defendants issued the following false and misleading statements about the Can Read System on its website:

- 8 -

CLASS ACTION COMPLAINT

Exhibit __A__ Page __17__

This incredible program has truly changed the lives of thousands of parents and their children. It demonstrates the importance of giving your child the tools early in life so they can enjoy life long opportunities for success.

\* \* \*

**Benefits of Early Literacy**

According to Your Baby Can Read! developer Dr. Robert Titzer, the current practice of starting to teach reading in school is too late. When children develop reading skills during their natural window of opportunity, from about birth to age four, they read better and are more likely to enjoy it.

In fact, studies prove that the earlier a child learns to read, the better they perform in school and later in life. Early readers have more self-esteem and are more likely to stay in school. Meanwhile, a national panel of reading specialists and educators determined that most of the nation's reading problems could be eliminated if children began reading earlier.

\* \* \*

**Getting started is as easy as ABC.** With the Your Baby Can Read! Deluxe Kit, you'll get a complete set of tools to unlock your child's reading potential.

\* \* \*

**Baby's First Teacher Pack.** Contains everything you need to help your child succeed!

Exhibit 1.

27.     Plaintiff alleges, on information and belief, in its radio and television infomercials defendants made the following misrepresentations about the effectiveness of the Can Read System:

Imagine your five year old reading junior high school level books. Imagine the head start this child would have on life. Finally, imagine all of this happening naturally - with smiles and laughter. And most importantly, with zero stress. Is this too amazing to be true? Are you skeptical? Because what I am about to show you will absolutely astonish you. Your baby can read.

\* \* \*

Imagine the head start that your child will have on life and happiness and their education. As a parent sitting there listening to me, I can't imagine that you don't want the best for your child. Your baby can read.

\* \* \*

If a child does not learn language skills, how to read until later in life, there are long term studies showing that fewer than one in eight ever catch up to reading at grade level again. There are also other studies showing that the earlier a child is taught to read the better the child reads.

I can tell you this, teaching them to read early in life opens up the door for all types of learning.

Exhibit _A_ Page _18_

1    Literally can any child learn to read?

2    If you start early in life then any child should be able to learn written language, within
     reason, of course there are always going to be few children here and there with severe
3    learning disabilities.

4    We have many examples of children who had learning disabilities or we have children
     with autism who have used our program. We have children with Down's syndrome who
5    have used our program and some of the most touching letters that I've ever gotten were
     from parents where for instance an 18-year month old baby with Down's syndrome
6    could read the words.

7        28.    As alleged below, the statements regarding the efficacy of the Can Read System with

8    respect to children with disabilities were particularly misleading.

9        29.    In an interview with BabyBrill.com in 2009, defendant Dr. Titzer claimed the following:

10   For dyslexia, the most common reading disorder, a lot of the children do not look at
     words from left to right. The [Your Baby Can Read! DVDs] can help prevent that
11   problem, because they're being taught, as babies, to look at words from left to right.

12   *See* Exhibit 3 and ¶¶22-23 above.

13       30.    These representations about the multisensory method and the effectiveness of the Can

14   Read System have been highly criticized by child development and behavioral scientists around the

15   country. Indeed, defendants were unable to produce any scientific studies to support their boisterous

16   claims when called to task on the nationally syndicated television program, The Today Show:

17   Dr. Titzer – We have a book full of studies that support the use of our program. It's
     literally thicker than this.
18
     The Today Show – Can you provide us that research?
19
     Dr. Titzer – Yes. Yes, I can.
20
     The Today Show – Instead of published research on Your Baby Can Read!, he sent us
21   this customer satisfaction survey conducted by his own company, along with general
     studies about child learning that experts we spoke to say he's twisting and taking out of
22   context.

23   Exhibit 4 (Dec. 28, 2010), http://today.msnbc.msn.com/id/39953918/ns/today-money.

24       31.    Doctors, scientists and reading experts have consistently criticized the Predecessor Can

25   Read System and the Can Read System as being a complete farce and have criticized defendant Dr.

26   Titzer as a greedy entrepreneur who is simply raising false expectations amongst parents.

27       32.    Since as early as 1998, the scientific community has reacted with skepticism to the

28   Predecessor Can Read System. On August 29, 1998, the Los Angeles Times published an article

- 10 -

CLASS ACTION COMPLAINT

Exhibit _A_ Page_ 19_

1  entitled "TOO YOUNG TO READ?," which stated the following about the Predecessor Can Read

2  System:

3  Robert Titzer didn't come to Orange County to be invisible.

4  Before starting his new teaching job at Cal State Fullerton on Wednesday the Ph.D. in
   human performance was standing in front of a crowd of parents at an Irvine baby store,
5  touting his video "Your Baby Can Read." Copies were available on site, at $ 13.99 a
   shot. Unlike most academics, he comes equipped with his own public relations man.

6  According to Titzer's teachings, infants as young as 9 months can read, as long as
7  parents don't wait too long to start. Say, by about 3 or 4 months of age.

8  Titzer concedes that his main study for this theory, and for the book and video he sells
   via his Web site, is based on his own daughters, now 4 and 7. He has published
9  academic papers in the field of human learning, but not about infant reading. And when
   challenged by the criticisms of other child-development experts who say babies cannot
10 truly read, Titzer acknowledges that what the infants are doing is memorizing the
   images of a few words, which despite the title of his video cannot be called reading.

11
   "Initially it's simple word recognition," he said, adding that it takes several months for
12 babies to respond to the word images. But he defends its worth. "There is this window
   of opportunity for learning language and earlier is better."

13
   Titzer's critics abound, but he also has supporters, who say that in some areas of child
14 development he has done solid and important work. A number of fans also showed up at
   his Irvine talk, parents who like what he has to say and several who snapped up copies
15 of his video.

16 "He's like a god," said Corinda Vasquez about Titzer. She was one of the parents at
   Babies R Us who had been using the video with her child. "He can't do any wrong in
17 our eyes."

18 Her 14-month-old son, Tanner, has been watching the video for almost a year. "I hate to
   brag, but Tanner is so smart due to Dr. Titzer's teachings," she said.

19
   The 30-minute video flashes more than 50 words in a sequence followed by a pictorial
20 representation of the word. For example, the word "bellybutton" lingers on the screen,
   with a slow pronunciation, followed by footage of a child pointing to her bellybutton.

21
   Tanner, after a year of watching Titzer's video, responds to all 50 words. "He needs to
22 see more words in order to learn to read new words," said Titzer. "Now he can only read
   the words in the video. But that's still quite impressive."

23
   Titzer, 38, said that when his daughter was 9 months old, before she could talk, she
24 would recognize words. If he held up a placard with the word "mouth" on it, she'd open
   her mouth. "Reading is the most important skill that parents can teach their children," he
25 said.

26 Titzer's academic credibility isn't questioned by his colleagues at Cal State Fullerton,
   says Roberta Rikli, chair of the college's division of kinesiology and health promotion,
27 who hired Titzer.

28

- 11 -

CLASS ACTION COMPLAINT

Exhibit _A_ Page _20_

1   "People are mostly quizzical about his work rather than critical," said Rikli. "They are
2   waiting to see if it's for real."

3   Cal State Fullerton hired Titzer as a part-time adjunct faculty member, where he will be
    paid $ 11,000 to teach and conduct research about infant reading to further his theory—
4   and, critics say, his company profits.

5   "The lack of rigorous scientific review combined with the commercialization of the
    product leaves me a bit suspect," said Matthew Melmed, executive director of the Zero
6   to Three Foundation in Washington D.C., an organization that conducts research on
    young childhood.

7   "Perhaps it impresses adults if a very young child can repeat words like an orangutan,
8   but it doesn't promote their long term-brain power," he said.

9   Titzer rejects the notion that his work is any more commercial than what other
    academics do. Some professors write textbooks and require students to buy them, he
10  said. "I'm not getting rich off this," he said, and parents can make their own videos or
    use flash cards.

11  Melmed's concern with Titzer's work is that parents may wind up teaching rote
    memory-based learning rather than cultivating thinking, thereby undermining a child's
12  long-term progress.

13  Defending his video, Titzer says Melmed's claim that it won't lead to higher thinking
14  skills is ridiculous.

15  "Babies gain by learning new words, and learning new words helps their thinking
    skills," he said.

16  Melmed advises parents to resist the hype of rearing an uber-baby. "Being able to read
17  at a young age does not guarantee that a child is going to be successful later," he said.

18  Another child development expert questioned the use of videotapes to teach very young
    children.

19  "In the first two to three years of life, the best learning occurs in terms of human
    interaction, not in the form of videotapes," said Dr. Stanley Greenspan, clinical
20  professor of psychiatry and pediatrics at George Washington University Medical School
21  in Washington, D.C.

22  Titzer said he never meant for his video to replace human interaction. "Most parents
    don't have 24 hours a day to spend with their babies, unfortunately," he said. "This
23  video can be valuable to stimulate brain development while the parents are busy doing
    other activities."

24  Concerns about his methodology and scope haven't kept Titzer's business, Infant
    Learning Company, from selling 9,000 copies of the tape via the Web site. He doesn't
25  know how many have been sold via bookstores.

26  "I'm willing to do whatever it takes to help my child," said Carolyn Pinkney of Irvine,
    who attended Titzer's recent talk.

27  However, Pinkney is cautious about the benefits of Titzer's video, which she's been
28  watching with her 11-month-old daughter, London.

- 12 -
CLASS ACTION COMPLAINT

"Some people say that you shouldn't push a child at this age," she said. "But I'm not going to lock her up, tie her to a chair and make her watch the video."

Titzer moved to California this month after working for two years in a tenure-track job at Southeastern Louisiana University. He has a PhD from Indiana University and a master's degree from Pennsylvania State University. Betty Baker, who hired Titzer at Southeastern Louisiana University, said that while it might be too early for him to draw conclusions in his work on infant reading, she believes he will "have a reputable amount of subjects and data" at some point.

His work on infant memory will be published this year by the Psychological Review in Los Angeles.

According to Robert Bjork, professor at UCLA and editor of Psychological Review, the paper is an "ambitious theory" designed to account for errors that infants make in search tasks. Bjork said he can't speak to Titzer's work on infant reading, which this paper does not address, but that the paper is "a major theoretical contribution."

But Bjork also expressed concerns about Titzer's claims of teaching infants to read, saying anxious and ambitious parents are easy prey for the latest educational fad. "Parents are very concerned, so they can be susceptible to these kind of claims," he said.

Exhibit 5.

33.    On April 2, 2000, the Plain Dealer (Cleveland, Ohio) published an article entitled "Experts Doubt Brain-Boosting Claims for Products, But Sales Soar," which stated the following about the Predecessor Can Read System:

The videotape shows 50 words one by one, while bouncy music plays in the background.

"This says crawling,'" the narrator intones as the word appears onscreen. "Can you say crawling?"

But crawling is an alien concept for many in the video's target audience. They're too young to even sit up.

The videotape, called "Your Baby Can Read!" is designed for children as young as 3 months. And it's just one in a wave of popular new products that claim they can stimulate brain development during the critical first three years of life.

There are also "Brainy Baby" and "Baby Shakespeare" videos. Flashcards and educational software programs for infants. Cassette tapes to teach Spanish, German or French. Classical music CDs to strengthen the neural pathways "linked to abstract and spatial reasoning."

Although most child development specialists say it's doubtful these products will make your child smarter, manufacturers and toy stores say they're selling briskly.

Robert Titzer, a San Diego public school teacher, said he has sold almost 60,000 of his $15 "Your Baby Can Read!" videos since their 1997 debut.

CLASS ACTION COMPLAINT

Exhibit A Page 22

The Baby Einstein Co., also launched in 1997 by a Colorado at-home mom, had sales of $3.4 million last year and expects to sell $20 million of its videos, CDs and flashcards for babies this year.

Sales of computer software for babies and toddlers have doubled since 1997, according to the market research company PC Data.

Science vs. psychology

The trend has drawn rebukes from many child-development researchers, who say the makers of such products are misinterpreting the findings of neuroscience and causing parents to worry needlessly about their baby's development. Infants and toddlers grow intellectually through everyday experiences rather than because of any particular toy or video, several experts said.

"We do know . . . the types of experiences and relationships a baby has in the first few months and years of life are critically important," said Matthew Melmed, executive director of Zero to Three, a nonprofit group that studies young children's development. "But to translate that research into specific products to boost babies' brainpower is really an abomination - a commercial abomination."

The makers defend their claims by citing research studies on brain growth, although the studies did not involve their products. In a few cases, the companies point to scientists they consulted and to awards the products have won from various organizations.

Debra Mills, a neuroscientist at the University of California at San Diego who consulted on the development of "Brilliant Beginnings," a $40 book-and-CD kit for parents interested in "nurturing the genius in your child," acknowledged there are no studies linking brain growth to specific infant activities. Nevertheless, she said, the kit is a useful guide to the enriching experiences a baby needs.

"A lot of parents don't know what to do, even very well-educated people," Mills said. "This just gives a minicourse in human development."

Parents buying the items say they want to make sure their children don't fall behind at a crucial stage in their development.

But educators and researchers say there's no cause for such worrying. Parents who read and play with their babies, respond to their cues and show them affection are giving them all that's needed for optimum brain development, they say. What matters are "things that good parents have known how to do since the beginning of time," said Robert Slavin, an educational researcher at Johns Hopkins University.

Critics of the smart-baby products say those who market them are confusing neurology, the study of the brain as a spongy, grayish lump, and psychology, the study of human behavior.

There are many psychological studies, having nothing to do with brain cells, showing that very young children deprived of normal experiences develop emotional or intellectual disabilities. Meanwhile, neurologists have discovered that the number of synapses, or vital connection points, in the brain increases enormously from before birth to age 3 and begins to drop in early puberty.

- 14 -

CLASS ACTION COMPLAINT

1   But scientists say there's no evidence that this surge of synapses will get an extra boost
2   from particular images, sounds or activities, although brain growth can decrease when
    children are severely abused or neglected.

3   "There are no data to show that with each new experience you're adding synaptic
    connections," said Harry Chugani, director of the PET center at Children's Hospital of
4   Michigan, who has been at the forefront of research into children's brain development.

5   Although school officials have stressed reading aloud and giving books to children
    before they start kindergarten, several educators are skeptical about products designed to
6   teach babies how to read. While it's possible for a child under age 2 to look at a printed
    word, say it aloud and point to an object to demonstrate the word's meaning, they
7   question whether that will make the child a better reader in later years.

8   The best advice for raising a smart baby, said Robert Pianta, professor of clinical
    psychology at the University of Virginia, is "relax and enjoy playing with your
9   children."

10  Exhibit 6.

11      34.    Despite the criticisms available to the public about the Predecessor Can Read System,

12  Dr. Titzer continued to tout the efficacy of the Can Read Systems.  Indeed, since 2007, defendants

13  engaged in a marketing campaign that marketed the purportedly new, but more expensive, Can Read

14  System.  Defendants marketing campaign was created to influence consumers about the efficacy of the

15  Can Read System.

16      35.    On July 2, 2009, Dr. Steven Novella, an academic clinical neurologist at Yale University

17  School of Medicine, analyzed the Can Read System and the claims made by defendants on his

18  *NueroLogica Blog* and emphatically concluded that no scientific research supports the efficacy of the

19  products:

20      I have received numerous questions recently regarding the latest infomercial
        craze called Your Baby Can Read. This is a program that promises to teach infants and
21      toddlers how to read, giving them a jump start on their education. Their website claims:

22      "A baby's brain thrives on stimulation and develops at a phenomenal pace . . .
        early 90% during the first five years of life! The best and easiest time to learn a
23      language is during the infant and toddler years, when the brain is creating thousands of
        synapses every second – allowing a child to learn both the written word and spoken
24      word simultaneously, and with much more ease."

25      This is mostly true – in fact the first four years of life is not only the best time to
        learn a language, it is the only time that language itself can be acquired. If a child is
26      completely deprived of exposure to language during this time the neuro-developmental
        window will close. People can still, of course, learn second languages after the age of
27      four, but it is more difficult and their brains will never be as hard-wired for those second
        languages as they are for a primary language learned before age four.

28

- 15 -

CLASS ACTION COMPLAINT

*But the company goes off the rails of evidence when it conflates language with reading.* There is no window of opportunity for reading like there is with language – adults who have never read can learn how to read. And while our brains are pre-programmed to absorb language, reading is more of a cultural adaptation.

*The site also abuses evidence when it claims that*:

"Studies prove that the earlier a child learns to read, the better they perform in school and later in life."

Yes – but this might have something to do with smarter kids being able to learn to read earlier. Also, smarter parents, or just parents in a more stable and nurturing environment, may be more likely to read to their children early. What we have is correlational data with lots of variables. None of this necessarily means that forcing kids to learn to read early has any advantage.

In general studies of neurological development and education show that forcing kids to learn some task before their brains are naturally ready does not have any advantage. *You cannot force the brain to develop quicker or better. In fact, it seems that children need only a minimally stimulating environment for their brain development program to unfold as it is destined to.*

*This further means that the whole "baby genius" industry for anxious parents is misguided. This is just the latest incarnation of this fiction.*

There is another layer to this debate, however – that between phonics and whole word or whole language reading. One school of thought believes that children learn to read by first mastering the sounds that letters make then putting them together (ala hooked on phonics). The second school of thought believes the children read whole works, and therefore can be taught to memorize whole words and the phonemic understanding will come later in its own time.

In recent years the phonics side of this debate has been dominant in the education community. But the whole word group is a vocal minority.

However it also seems that there is an emerging third group who combine the two methods in a practical way. People read by both constructing words from their phonetic parts, an also by memorizing and reading whole words. Have you ever received this e-mail:

"Aroedniceg to rsceearch at Cmabrigde Uinervtisy, it deosn't mttaer in waht oredr the ltteers in a wrod are, the olny iprmoatnt tihng is taht the frist and lsat ltteer are in the rghit pcale. The rset can be a toatl mses and you can sitll raed it wouthit pobelrm. Tihs is buseace the huamn mnid deos not raed ervey lteter by istlef, but the wrod as a wlohe."

This would seem to support the whole word school of thought. However, we also learn new words by sounding them out, and still have to do this for uncommon words. So a blended approach seems practical and is gaining acceptance.

The Your Baby Can Read program is an extreme whole word approach. Infants and toddlers are taught to memorize words, which they can then recognize and name from memory, even before they can understand what they are reading. Critics of this approach claim that this is not really reading, just memorization and association. Some even caution that by taking an extreme whole word approach, phonic understanding can be delayed and the net result can be negative.

- 16 -

CLASS ACTION COMPLAINT

Others are critical of this entire approach of forced learning at a very young age. It is more productive, they argue, to give the child a loving supportive environment and let their brain develop as it will.  You are far better off spending your time playing with and bonding with your child than engaged in drills or having them sit in front of a video.

*There also does not appear to be any evidence that programs like Your Baby Can Read have any long term advantage. Their website does not provide links to any published studies to support their claims. Regarding the founder it declares:*

*Dr. Titzer's research has been published in scientific journals, including the prestigious Psychological Review.*

*True — but misleading as a Pubmed search on Titzer R came up with only two publications, neither of which have anything to do with learning to read.  His Wikipedia page claims that he has published no scholarly work on infant reading.*

Conclusion

*While the background concepts are quite interesting, the bottom line is that we have another product being marketed to the public with amazing claims and no rigorous scientific evidence to back them up. This product also falls into the broader category of gimmicky products claiming to make children smarter or more successful academically.*

*Anxious parents wanting to give their kids every advantage is a great marketing demographic, in that they are easily exploited. But like all gimmicky schemes promising easy answers to complex or difficult problems (weight loss, relationships, or academic success) in the end it is likely to be nothing but a costly distraction from more common sense approaches -- like just spending quality time with your kids and giving them a rich and save environment. What such products often really provide is a false sense of control.*

Exhibit 7 (Dec. 28, 2010), http://theness.com/neurologicablog/?p=569.

36.    Dr. Novella responded to a post criticizing his July 2, 2009 conclusions with respect to the Can Read System:

John,

Thanks for your thoughtful feedback. However, I disagree with your reading of my post. Essentially, you seem to agree with my core point -- the company makes claims not backed by adequate evidence, but disagree with the form of my critique.

For example, you object to my use of the term "force" -- but you misread my usage. This is not meant to be emotive -- I use the term "force" to mean that you can make something happen ahead of schedule.

You also misread my use of the word "extreme" -- again, this was used specifically to mean one end of a spectrum. I understand that the instructions include other techniques, but the core of the program and the way it is sold is at one end of the reading strategy spectrum.

Further, I disagree that all we can say is that this product lacks evidence. We do have a body of neurological research that indicates that as people mature they reach

CLASS ACTION COMPLAINT

Exhibit *A* Page *26*

1   their intellectual potential, as long as they do no[t] have a deprived environment. Doing
2   extra or early work does not improve long term outcomes. So this is a reasonable default
    position unless there is evidence to suggest otherwise -- which you agree, there isn't.

3   And to clarify – I am not talking about fund of knowledge, but rather intellectual
4   skills, like reading.

5   If the program encourages quality time between parent and child, fine. But then
    you could do this without spending any money on a program – which is what I
6   recommended.

7   I also did not mean the term "anxious" to be derogatory. I am an anxious parent
    -- all parents should be appropriately anxious. Anxiety is an adaptive trait. Appropriately
    concerned, anxious, motivated parents are easy to exploit by making them feel as if they
8   are missing out if they don't buy some product.

9   ***So I completely stand by my characterization that this product makes
    unsubstantiated claims, lacks plausibility, is conceptually problematic, and very
10  deliberately exploits their target demographic.***

11  *Id.*

12  37.    On November 1, 2010,  an msnbc.com article, by Jeff Rossen and Robert Powell,
13  entitled "'Your Baby Can Read' Claims Overblown, Experts Say," reported that defendants' statements
14  concerning the Can Read System are false and misleading:

15  Ginger Torres was fascinated by the television commercials featuring babies, some as
    young as 3 months old, reading. Not just words but phrases, like "Touch your ears."
16
    The ads boasted that the remarkable achievement was made possible by "Your Baby
17  Can Read," a program which promised that with the use of flash cards, DVDs, pop-up
    books and some quality time between parent and child, almost any preschooler could
18  learn to read before they even entered kindergarten.

19  Ginger Torres wanted that for her 3-year-old daughter, Chloe, so she bought the kit. It
    was a decision she would come to regret. "The reason I wanted to buy it is to give her a
20  head start before school," Torres said. "[But] what you're getting is not really what they
    say."
21
    Reading or memorization?
22
    TODAY wanted to find out if the claims were true, so child development experts from
23  the nation's most prestigious institutions of learning were contacted as part of an
    investigation of the "Your Baby Can Read" program.
24
    Are those babies really reading?
25
    "No," said Dr. Nonie Lesaux, a child development expert at the Harvard University
26  Graduate School of Education. "They memorize what's on those cue cards ... It's not
    reading."
27
    "It's an extraordinary manipulation of facts," said Dr. Maryanne Wolf, director of
28  Cognitive Neuroscience at Tufts University.

- 18 -

CLASS ACTION COMPLAINT

Exhibit ___A___ Page ___27___

From coast to coast, TODAY found 10 experts who were all of the same basic opinion: Young children can be made to recognize or memorize words, but the brains of infants and toddlers are just not developed enough to actually learn to read at the level the way the enticing television ads claim they can.

There are some remarkable exceptions, like the toddler who surprised Ann Curry on TODAY in 2008 when Curry pulled out a cue card with a word the child had never seen before. She successfully mouthed the word "kangaroo," but experts say the vast majority of children cannot be taught to read until their brains are developed enough.

Dashed hopes

The problem with programs like "Your Baby Can Read," the experts TODAY contacted say, is that they promise such results routinely, raising hopes that will only be dashed.

"I think it's misleading. I think it's false, and I think it raises false expectations," said Dr. Karen Hopkins, a developmental pediatrician at New York University's Langone Medical Center.

Asked about the experts' collective opinion that children cannot really learn to read until they are 4 or 5 years old, the creator of "Your Baby Can Read" offered a simple explanation.

"They're all wrong," said Dr. Robert Titzer, who calls himself an infant learning expert but actually holds a graduate degree in "human performance" — the study of motor skills.

Titzer told TODAY his program is backed by scientific research. He acknowledged that it starts with memorization, but insisted it leads to reading ."We have a book full of studies that support the use of our program," Titzer said, agreeing to provide the research.

But instead of published research on "Your Baby Can Read," Titzer sent TODAY his own customer satisfaction surveys and general studies about child learning.

Titzer stood by his company's claims.

"The baby does learn to read," he said. "My children could read better at age 4 than I could at age, you know, at my age."

Titzer would not disclose how much money he's made off his program, but the company says more than a million "Your Baby Can Read" kits have been sold — some for as much as $200 in stores and online.

Ginger Torres got her money back after complaining to the company, but believes the program is still cashing in on false promises.

"I was very upset because I felt so misled," Torres said.

The experts say the best way to teach your children reading skills is the time-honored one that doesn't cost a dime.

Read to them. Talk to them. Play with them. If a child is having fun, he or she will learn.

Exhibit 4.

CLASS ACTION COMPLAINT

Exhibit _A_ Page _28_

38.     Matthew Melmed, an Executive Director of the National Center for Infants, Toddlers and Families was similarly skeptical about defendants' claims:

> "I take the position, based on extensive research we have on the early years of life, that most of these products are useless. Some can even be harmful. Babies don't need a flat, one-dimensional screen that isn't responding to them. What babies need are relationships with a small number of adults who know them, who are capable of reading and responding to their cues in a sensitive fashion. Products that are designed to essentially have them not interact with adults will do nothing toward that. You can't buy a relationship."

Exhibit 8 (Dec. 28, 2010), http://www.southjersey.com/articles/?articleID=1446.

39.     Dr. Robert Needlman, M.D., an professor in pediatrics, stated the following about Dr. Titzer's representations:

> There's a lot of hype that says that children have to be exposed to all sorts of things or else they'll be crippled for life and that's simply not true. It's based on a misunderstanding of the scientific data. It does not mean that more and more structured and more school-like learning early on is helpful for children and it simply isn't. I am a huge believer in reading aloud to young children from a very early age, not to teach them to read early. The child who reads at age three or four is not necessarily going to do better in life than a child who reads at age five or six. [Parents] shouldn't kid themselves into thinking that this experience is somehow wonderfully stimulating for their baby. It isn't.

(Dec. 28, 2010), http://today.msnbc.msn.com/id/39953918/ns/today-money (video).

40.     Defendants have had actual knowledge of the inefficacy of the Can Read Systems since at least as early as 2000 as a result of, *inter alia*, numerous complaints, including those complaints posted on public websites. Upon information and belief, complaints of the products' ineffectiveness were conveyed to at least one of the defendants.   Below is the relevant excerpt from one of these complaints:

| Source / Date | Relevant Portion |
|---|---|
| Mamapedia.com<br>July 2009 | My daughter learned some word recognition, like Hi, Car, Star at 19 months...however at age 3 she does not know these words anymore.<br>* * *<br>I got suckered in to this program. I feel it was a waste of money. My three year old likes to watch them now and then but so far we have not seen results like was shown on tv. |

- 20 -

CLASS ACTION COMPLAINT

Exhibit  A  Page  29

41.    Had plaintiff and the Class known the truth about the Can Read Systems, they would not have purchased these products. Moreover, Class members were unable to return the product as the "30 day money back guarantee"[3] was deceptive. Dr. Titzer on the one hand admitted that consumers of the Can Read Systems "need to be consistent about it for six months" in order to notice some beneficial impact on the child's reading abilities, yet, on the other hand, defendants' guarantees expire after only one month.

## CLASS ACTION ALLEGATIONS

42.    This is a case where the plaintiff and the Class shared interest in common property is at stake.

43.    Plaintiff brings this action, on behalf of herself and all other persons similarly situated, as a class action pursuant to C.C.P. §382. The class which plaintiff seeks to represent is composed of and defined as follows:

> All individuals who purchased or acquired any of the Can Read Systems from December 2006 through the date on which notice of this action is provided to Class Members (the "Class Period").

> Specifically excluded from the Class are defendants, officers, directors or employees of Your Baby, any entity in which any defendants have a controlling interest and any of the affiliates, legal representatives, attorneys, heirs or assigns of defendants. Plaintiff reserves her right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

44.    This case has been brought and may properly be maintained as a class action, pursuant to the provisions of C.C.P. §382 because, *inter alia*, there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

45.    **Numerosity:** The Class is so numerous and geographically dispersed that the individual joinder of all members is impracticable under the circumstances of this case. While the exact number of class members is unknown to plaintiff at this time, plaintiff is informed and believes that thousands of purchasers exist to make joinder of all members of the Class impracticable.

---

[3]    Exhibit 9.

- 21 -

CLASS ACTION COMPLAINT

Exhibit __A__ Page __30__

1    46.    **Common Questions Predominate:** Common questions of law and fact exist as to

2  plaintiff and all Class members and predominant over any questions which affect only individual

3  members of the Class. These common questions of law and fact include, without limitation:

4            (a)     Whether defendants engaged in a common course of conduct that is likely to

5  deceive plaintiff in connection with the marketing of the Can Read Systems;

6            (b)     Whether the Can Read Systems fail to effectively do what defendants advertised;

7            (c)     Whether the products failed to have qualities, characteristics, effects, or

8  otherwise as they were marketed and sold by defendants;

9            (d)     Whether the laws were violated by defendants, as alleged herein, by engaging in

10  the described practices;

11           (e)     Whether plaintiff and the Class are entitled to declaratory, injunctive and/or

12  equitable relief; and

13           (f)     Whether plaintiff and the Class are entitled to compensatory damages.

14    47.    **Typicality:** Plaintiff's claims are typical to the claims of Class members. Plaintiff and

15  the Class sustained damages arising out of defendants' common course of conduct in violation of law as

16  complained of herein. The damages of each Class member was caused directly by defendants'

17  wrongful conduct in violation of law as alleged herein.

18    48.    **Adequacy:** Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff

19  is an adequate representative of the Class and has no interests which are adverse to the interests of

20  absent class members. Plaintiff has retained counsel who have substantial experience and success in the

21  prosecution of complex class action and consumer protection litigation.

22    49.    **Superiority:** A class action is superior to other available means for the fair and efficient

23  adjudication of this controversy since individual joinder of all Class members is impracticable. Class

24  action treatment will permit a large number of similarly situated persons to prosecute their common

25  claims in a single forum simultaneously, efficiently and without the unnecessary duplication of effort

26  and expense that numerous actions would engender. Furthermore, the expenses and burden of

27  individual litigants and the lack of knowledge of Class members regarding defendants' activities, would

28  make it difficult or impossible for individual Class members to redress the wrongs done to them, while

CLASS ACTION COMPLAINT

Exhibit___A___Page___31___

1   an important public interest will be served by addressing the matter as a class action. The cost to the

2   court system of adjudication of such individualized litigation would be substantial. Individualized

3   litigation would also present the potential for inconsistent or contradictory judgments.

4         50.    Plaintiff is unaware of any difficulties that are likely to be encountered in the

5   management of this action that would preclude its maintenance as a class action.

6         51.    Defendants have, or have access to, address information for the Class members, which

7   may be used for the purpose of providing notice of the pendency of this class action.

8         52.    Plaintiff seeks preliminary and permanent injunctive, and equitable relief on behalf of

9   the entire Class, on grounds generally applicable to the entire Class, to enjoin and prevent defendants

10   from engaging in the acts described, and to obtain full restitution to plaintiff and the Class.

11         53.    Absent a class action, defendants' violation of the law will continue and they will

12   continue to reap and retain the substantial proceeds received as a result of their improper conduct.

13                          **FIRST CAUSE OF ACTION**

14   **(Unlawful Business Acts and Practices in Violation of California Business & Professions Code §17200, *et seq.*)**

15         54.    Plaintiff incorporates the above allegations by reference as if set forth herein.

16         55.    Section 17200 of the California Business & Professions Code prohibits "unlawful,"

17   "unfair" and "fraudulent" business practices. Unfair competition also includes unfair, deceptive, untrue

18   or misleading advertising. The Act provides for injunctive relief and restitution for violations.

19         56.    Defendants have violated §17200 by falsely marketing the Can Read Systems.

20   Defendants falsely represented to consumers that, *inter alia*, the Can Read Systems could teach infants

21   and children to read at a very young age. Defendants further misrepresented that scientific trials were

22   conducted proving defendants' outlandish assertions. In fact, the exact opposite was true, as many

23   scientists and experts concluded that the Can Read Systems were ineffective and worthless.

24         57.    Despite knowing that their products could not teach infants how to read, defendants

25   conducted a ubiquitous marketing campaign. In furtherance of their scheme, defendants knowingly

26   and/or recklessly disseminated the following false and misleading claims to vulnerable new parents and

27   other unsuspecting educators about the Can Read Systems:

28

(a)   that the products can teach a three month old baby to read by nine months old;

(b)   that the products can enable a five year old to read junior high school level books;

(c)   that the products can teach infants suffering from Down's syndrome how to read;

(d)   that the products can teach an infant how to read at an early age and that this would prevent learning disabilities, including dyslexia; and

(e)   that studies performed by the scientific community "support the use" of the products.

58.   Business & Professions Code §17200 prohibits any *"unlawful . . .* business act or practice." Defendants have violated §17200's prohibition against engaging in an unlawful act or practice by, *inter alia,* making material misrepresentations and omissions regarding their products as set forth more fully elsewhere in this Complaint in violation of Cal. Civ. Code §§1572 (actual fraud), 1573 (constructive fraud), 1709 and 1710 (deceit), 1750 *et seq.* (the CLRA); Cal. Bus. & Prof. Code §17500 (false advertising); and the common law, including the breach of contract and breach of the duty to disclose. Plaintiff reserves her right to allege other violations of law which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

59.   Business & Professions Code §17200 also prohibits any *"unfair . . .* business act or practice." As detailed in the preceding paragraphs, defendants engaged in a course of conduct to mislead vulnerable parents and other consumers concerning the features and qualities of their products, violating fundamental policies of this State. Defendants' business practices as detailed above are also immoral, unethical, oppressive or unscrupulous. Further, any justification for defendants' wrongful conduct are vastly outweighed by the adverse effects of such conduct. As a result, defendants engaged in unfair business practices prohibited by Business & Professions Code §17200 *et seq.*

60.   Business & Professions Code §17200 also prohibits any *"fraudulent* business act or practice." Defendants violated this prong of the UCL by disseminating, through common advertising, untrue statements about their products that have a tendency to mislead the public and making numerous common material misrepresentations with the intent to induce reliance by consumers to purchase these

- 24 -

CLASS ACTION COMPLAINT

Exhibit __A__ Page __33__

1   products. As detailed in the preceding paragraphs, defendants' course of conduct and advertising

2   campaign were likely to deceive parents and other consuming members of the public.

3       61.     Pursuant to Business & Professions Code §17203, plaintiff seeks an order requiring

4   defendants to immediately cease such acts of unlawful, unfair and fraudulent business practices and

5   requiring defendants to return the full amount of money improperly collected to all those who have paid

6   them.

7       62.     Defendants' unfair competition caused harm to plaintiff and the Class, as they purchased

8   an unsubstantiated product whose efficacy was misrepresented by defendants. Plaintiff and the Class

9   paid more than they would have paid had defendants not concealed the truth concerning the Can Read

10  System. Had plaintiff and the Class known the truth about the Can Read Systems, a clearly material

11  fact, they would not have purchased these products.

12      63.     The above-described acts conducted by defendants continue to this day to present a

13  threat to the Class in that defendants have failed and refused to publicly acknowledge the wrongdoing

14  of their actions, issue a recall, or publicly issue a disclaimer to actual and potential Class members of

15  their continued deceptive practices.

16      64.     As a result of the conduct described above, defendants have been and will be unjustly

17  enriched at the expense of plaintiff and the Class.

18                          SECOND CAUSE OF ACTION

19  (False and Misleading Advertising in Violation of California Business & Professions Code
                              §17500, *et seq.*)

20      65.     Plaintiff incorporates the above allegations by reference as if set forth herein.

21      66.     California Business & Professions Code §17500 prohibits various deceptive practices in

22  connection with the dissemination in any manner of representations which are likely to deceive

23  members of the public to purchase products and services such as Can Read System.

24      67.     Defendants' acts and practices as described herein have deceived and/or are likely to

25  deceive plaintiff and the Class. Defendants have spent over $37 million to advertise, including through

26  their websites on the Internet, to call attention to, or give publicity to the Can Read Systems. Despite

27  knowing that their products could not teach infants how to read, defendants conducted this ubiquitous

28

                                - 25 -
                        CLASS ACTION COMPLAINT

1  marketing campaign. . In furtherance of their scheme, defendants knowingly and/or recklessly

2  disseminated the following false and misleading claims in a way that would lead a reasonable consumer

3  to believe the following about the Can Read Systems:

4         (a)    that the products can teach a three month old baby to read by nine months old;

5         (b)    that the products can enable a five year old to read junior high school level

6  books;

7         (c)    that the products can teach infants suffering from Down's syndrome how to read;

8         (d)    that the products can teach an infant how to read at an early age and that this

9  would prevent learning disabilities, including dyslexia; and

10         (e)    that studies performed by the scientific community "support the use" of the

11  products.

12      68.    By their actions, defendants are disseminating uniform advertising concerning their

13  products and services, which by its nature is unfair, deceptive, untrue, or misleading within the meaning

14  of California Business & Professions Code §17500, *et. seq.* Such advertisements are likely to deceive,

15  and continue to deceive, the consuming public for the reasons detailed above.

16      69.    Defendants intended plaintiff and the Class to rely upon the advertisements and

17  numerous material misrepresentations as set forth more fully elsewhere in the Complaint. In fact,

18  plaintiff and the Class relied upon the advertisements and misrepresentations to their detriment.

19      70.    The above-described false, misleading, and deceptive advertising defendants'

20  disseminated continues to have a likelihood to deceive in that defendants have failed to disclose the true

21  and actual performance of the Can Read Systems. Defendants have failed to instigate a public

22  information campaign to alert consumers of these deficiencies, which continues to create a misleading

23  perception of the efficacy of the Can Read Systems.

24      71.    In making and disseminating the statements alleged herein, defendants should have

25  known their advertisements were untrue and misleading in violation of California Business &

26  Professions Code §17500, *et seq.* Plaintiff and the Class members based their decisions to purchase the

27  Can Read Systems in substantial part on defendants' misrepresentations and omitted material facts. The

28  revenues to defendants attributable to products sold in those false and misleading advertisements

CLASS ACTION COMPLAINT

Exhibit _A_ Page _35_

1  amount to millions of dollars. Plaintiff and other Class members were injured in fact and lost money or
2  property as a result.

3      72.   The misrepresentations and non-disclosures by defendants of the material facts detailed
4  above constitute false and misleading advertising and therefore constitute a violation of California
5  Business & Professions Code §17500, *et. seq.*

6      73.   As a result of defendants' wrongful conduct, plaintiff and the Class request that this
7  Court cause defendants to restore money to them, and to enjoin defendants from continuing to violate
8  California Business & Professions Code §17500, *et. seq.*

9      74.   Such conduct is ongoing and continues to this date. Plaintiff and the Class are therefore
10 entitled to the relief as detailed below.

11                    **THIRD CAUSE OF ACTION**

12      **(Violations of the Consumer Legal Remedies Act, Civil Code §1750, *et seq.*)**

13      75.   Plaintiff incorporates the above allegations by reference as if set forth herein.

14      76.   The California Consumers Legal Remedies Act, Cal. Civ. Code §1750, *et seq.* (the
15 "Act"), provides California consumers with a comprehensive procedure for redressing defendants'
16 violations of various statutory rights.

17      77.   Plaintiff and the Class members are consumers as defined by Cal. Civ. Code §1761(d).
18 defendants' products constitute "services" and/or "goods" as defined by Cal. Civ. Code §1761(a) and
19 (b). At all times relevant hereto, defendants constituted "persons" as that term is defined in Cal. Civ.
20 Code §1761(c)

21      78.   Defendants' actions violate the Act in at least the following respects:

22          (a)   In violation of §1770(a)(5) of the Act, defendants' acts and practices constitute
23 misrepresentations that the goods in question have characteristics, benefits or uses which they do not
24 have;

25          (b)   In violation of §1770(a)(7) of the Act, defendants misrepresented that the goods
26 are of particular standard, quality and/or grade, when they are of another;

27          (c)   In violation of §1770(a)(9) of the Act, defendants' acts and practices constitute
28 the advertisement of the services in question without the intent to sell them as advertised;

1       (d)    In violation of §1770(a)(14) of the Act, defendants' acts and practices fail to

2 represent that the transaction involving the merchandise in question confers or involves obligations that

3 are prohibited by law; and

4       (e)    In violation of §1770(a)(16) of the Act, defendants' acts and practices constitute

5 representations that the subject of the transaction has been supplied in accordance with previous

6 representations when it has not.

7     79.    By reason of the foregoing, plaintiff and the Class have been irreparably harmed,

8 entitling them to both injunctive relief and restitution.

9     80.    Pursuant to §1782 of the Act, plaintiff notified defendants in writing of the particular

10 violations of §1770 of the Act and demanded defendants rectify the actions described above by

11 providing complete monetary relief, agreeing to be bound by their legal obligations and to give notice to

12 all affected customers of their intent to do so. Plaintiff sent this notice by certified mail, return receipt

13 requested, to defendants' principal place of business.

14     81.    If defendants fail to adequately respond to plaintiff's demand within 30 days of the letter

15 pursuant to §1782 of the Act, plaintiff will amend this claim to add additional claims for relief,

16 including claims for compensatory and exemplary damages. Plaintiff is already entitled to the relief set

17 forth above, along with costs, attorneys' fees and any other relief which the Court deems proper.

18 FOURTH CAUSE OF ACTION

19 (Breach of Contract)

20     82.    Plaintiff incorporates the above allegations by reference as if set forth herein.

21     83.    Plaintiff and the Class agreed to purchase the Can Read Systems from defendants.

22     84.    The terms of the contract were substantially identical as applied to all Class members.

23 The documents distributed by defendants and the Terms and Conditions governing the sales of the Can

24 Read Systems, were substantially identical as applied to all Class members.

25     85.    Defendants did not provide the agreed-upon services. Material terms of the sales

26 contract required defendants to provide the Can Read Systems as advertised. Defendants breached their

27 contractual obligations by disseminating false and misleading representations concerning the products

28 and providing products to plaintiff and the Class that could not perform as advertised.

- 28 -

CLASS ACTION COMPLAINT

Exhibit ___A___ Page ___37___

86.    Plaintiff and the Class relied on defendants' false and misleading representations to their detriment.

87.    Plaintiff and the Class have been damages as a result of defendants' breaches of their contracts.

### FIFTH CAUSE OF ACTION

#### (Negligent Misrepresentation)

88.    Plaintiff repeats and realleges the allegations contained in the paragraphs above as if fully set forth herein.

89.    Throughout the Class Period, defendants made misrepresentations and omissions to plaintiff and the Class concerning their products, including that their Can Read Systems:

     (a)    teach a three month old baby to read by nine months old;

     (b)    enable a five year old to read junior high school level books;

     (c)    teach infants suffering from Down's syndrome how to read;

     (d)    teach an infant how to read at an early age and that this would prevent learning disabilities, including dyslexia; and

     (e)    are supported by scientific studies concerning their efficacy.

90.    Defendants' misrepresentations and omissions are false and misleading because their products do not teach infants and small children to read, and there is no scientific support for the efficacy of these products.

91.    Defendants' representations are continuing and ongoing.  Defendants represented to plaintiff and each and every Class member that the above identified facts were true when they had no reasonable grounds for believing them to be true.

92.    Defendants made the representations and omissions set forth above with the intent to induce plaintiff and Class members to alter their position to their injury by buying or acquiring the products.

93.    Plaintiff and Class members reasonably believed that defendants' representations and omissions were true and were materially complete and did not know of the falsity of the representations and were unaware of the facts omitted which materially qualified the facts disclosed and rendered

CLASS ACTION COMPLAINT

1  defendants' representations likely to deceive. In reliance on defendants' representations and omissions,
2  in the belief that the representations were materially complete, and induced by the omissions which
3  materially qualified the facts disclosed, plaintiff and Class members purchased or acquired these
4  products and have been damaged in an amount to be determined at trial.

5                              SIXTH CAUSE OF ACTION
6                                 (Unjust Enrichment)

7      94.   Plaintiff incorporates the above allegations by reference as if set forth herein.

8      95.   Defendants have received, and continue to receive, a benefit at the expense of plaintiff
9  and the Class.

10     96.   Defendants knowingly and/or recklessly disseminated false and misleading claims to
11 plaintiff and the Class about the Can Read Systems. Plaintiff and the Class conferred upon defendants,
12 without knowledge of the truth concerning the Can Read Systems, payment for the product.
13 Accordingly, defendants have received benefits that they have unjustly retained at the expense of
14 plaintiff and the Class.

15     97.   As a direct and proximate result of defendants' unlawful acts and conduct, plaintiff and
16 the Class were deprived of the use of their money that was unlawfully charged and collected by
17 defendants, and are therefore entitled to reimbursement of any money unjustly paid to defendants in
18 connection with the sale of the Can Read Systems.

19                              PRAYER FOR RELIEF
20     Plaintiff, individually, and on behalf of the Class, prays for judgment and relief against
21 defendants as follows:

22     A.   For an order declaring this a class action;

23     B.   For an order enjoining defendants from continuing to sell the products and pursue the
24 above policies, acts and practices;

25     C.   For an order requiring defendants to fund a corrective advertising campaign in order to
26 remedy defendants' wrongful conduct;

27     D.   For an order awarding restitution of the monies defendants wrongfully acquired by
28 defendants' unfair, deceptive, and unlawful business practices;

- 30 -
CLASS ACTION COMPLAINT

Exhibit A Page 39

1       E.    For an order requiring disgorgement of monies wrongfully obtained as a result of

2   defendants' unlawful, unfair and deceptive business practices as alleged herein;

3       F.    For compensatory and punitive damages arising from defendants' unlawful and

4   fraudulent conduct as alleged herein;

5       G.    For reasonable attorneys' fees pursuant to statute or common law;

6       H.    For pre-judgment and post-judgment interest at the legal rate; and

7       I.    For costs of this suit; and

8       J.    For such other and further relief as the Court deems just and proper.

9                         **JURY DEMAND**

10       Plaintiff demands a trial by jury on all issues so triable.

11   DATED: December 29, 2010        ROBBINS GELLER RUDMAN

12                             &amp; DOWD LLP
                          RACHEL L. JENSEN

13

14                             *Rachel Jensen / with permission*

15                             RACHEL L. JENSEN

16                             655 West Broadway, Suite 1900
                          San Diego, CA 92101

17                             Telephone: 619/231-1058
                          619-231-7423 (fax)

18                             ROBBINS GELLER RUDMAN

19                             &amp; DOWD LLP
                          SAMUEL H. RUDMAN

20                             ROBERT M. ROTHMAN
                          MARK S. REICH

21                             EDWARD Y. KROUB
                          58 South Service Road, Suite 200

22                             Melville, NY 11747
                          Telephone: 631/367-7100

23                             631/367-1173 (fax)

24   S:\CptDraft\Consumer\Your Baby Can Cpt.doc      Attorneys for Plaintiff

25

26

27

28

                          - 31 -

Exhibit A Page 40

# EXHIBIT 1

Exhibit _A_ Page _41_

Your Baby Can Read® - Receive free shipping and bonus 5-DVD set just for trying!



First Name:

Last Name:

Email:

Phone:

Address:

Address 2:

City:

State:    Select State

Country:    United States

Zip:



## What Makes Your Baby Can Read!® So Special?

A baby's brain thrives on stimulation and develops at a phenomenal pace...nearly 90% during the first five years of life! The best and easiest time to learn a language is during the infant and toddler years...when the brain is creating thousands of synapses, or connections, allowing a child to learn both the written word and spoken word simultaneously.

Seize this small window of opportunity to enhance your child's learning ability with the Your Baby Can Read! Early Language Development System.

### Benefits of Early Literacy

According to Your Baby Can Read! developer Dr. Robert Titzer, the current practice of starting to teach reading in school is too late. When children develop reading skills during their natural window of opportunity, from about birth to age four, they read better and are more likely to enjoy it.

In fact, studies prove that the earlier a child learns to read, the better they perform in school and later in life. Early readers have more self-esteem and are more likely to stay in school. Meanwhile, a national panel of reading specialists and educators determined that most of the nation's reading problems could be eliminated if children began reading earlier.

### Human Brain Development
Synapse Formation Dependant on Early Experiences



http://www.yourbabycanread.com/

12/28/2010

Exhibit __A__ Page __42__

Your Baby Can Read® - Receive free shipping and bonus 5-DVD set just for trying!



## What You Get

Getting started is as easy as ABC. With the Your Baby Can Read! Deluxe Kit, you'll get a complete set of tools to unlock your child's reading potential.

For your child:

- **Your Baby Can Read! Complete 5-Level DVD Reading System.** These fun, interactive videos will keep your baby reading and entertained!
- **5 Sets of Sliding Words Cards.** The read & play cards accompany each level and reinforce what your child has learned.
- **5 Lift-a-Flap Books.** The word and picture books accompany each level and introduce familiar words from the DVDs in a new format.

For you:

**Baby's First Teacher Pack.** Contains everything you need to help your child succeed!

- **Parent's Guide.** Gives easy step-by-step instructions to the Your Baby Can Read! Program.
- **Early Learning Workshop DVD.** Dr. Titzer shares his secrets for a fun, multi-sensory approach to early language development.
- **Teaching Cards.** 15 Fun Games with 83 double-sided interactive Cards to play with your child!



## Baby's First Teacher Pack!

Contains everything you need to help your child succeed!



BONUS GIFT
$100.00 value
with purchase

Your Child Can Read 3-DVD SET! The Companion Series that Unlocks the Next Level of Your Child's Reading Potential!

Exhibit __A__ Page __43__

Your Baby Can Read® - Receive free shipping and bonus 5-DVD set just for trying!

## Watch the Videos

See what people are saying
about Your Baby Can Read.



 Lindsey

 Brandy

Brian

 Kendra

 Angie

Lori





*Free Shipping and $14.95 Trial Offer are only available for orders shipped within the US, Alaska, Hawaii, Canada and AE/AA/AP addresses.

Copyright © 2010 Your Baby Can, LLC. All Rights Reserved. Privacy Policy | Customer Service | Terms and Conditions |
Select Your Country:

- USA
- Australia
- Bangladesh
- Barbados
- China (Hong Kong)
- Colombia
- India
- Mexico
- Netherlands
- New Zealand
- Pakistan
- South Africa
- Sri Lanka
- United Kingdom
- Venezuela

http://www.yourbabycanread.com/                                12/28/2010

Exhibit __A__ Page __44__

# EXHIBIT 2

Early Learning | Multisensory Method | Early education | Teach Baby

BRILLKIDS     BRILLBABY     FORUM     ONLINE STORE     SUPPORT

HOME     EARLY LEARNING BASICS     PRENATAL EDUCATION     AFTER BIRTH (0-4 M)     TEACHING BABY     FREE DOWNLOADS

## A Method for Teaching to Read
## THE MULTISENSORY METHOD

Sign up for our
Early Learning Essentials
FREE Newsletter!

### Introduction

The multisensory method of teaching babies to read ...



SHARE THIS PAGE

Philosophy...

**TEACHING YOUR BABY TO READ**

**YOUR BABY'S PHYSICAL DEVELOPMENT**

**TEACHING YOUR BABY MATH**

The Multisensory Method Philosophy | Multisensory Reading and Learning | Teach Baby

BRILLKIDS      BRILLBABY      FORUM      ONLINE STORE      SUPPORT

HOME      EARLY LEARNING BASICS      PRENATAL EDUCATION      AFTER BIRTH (0-4 M)      TEACHING BABY      FREE DOWNLOADS

## A Method for Teaching to Read
## THE MULTISENSORY METHOD

Sign up for our
Early Learning Essentials
FREE Newsletter

### Philosophy

Parents naturally make use of multiple sensory signals to communicate with their children – something as simple as saying, "That's your nose," and touching your baby's nose is multisensory teaching. Having heard the word "nose" and seen, and perhaps felt her nose touched, your child will be more likely to remember the word's meaning. Or, you might sing Head, Shoulders, Knees And Toes to your child, while helping her touch each part of her body in turn. Children learn body parts much more rapidly when taught in this way than when they simply hear the words used in context.



No one understands the value of multisensory learning better than infant researcher Robert Titzer. After years spent studying how babies learn, Titzer decided to introduce the written word to his first child, Aleka, in infancy. Having taught Aleka to read some 50 whole words by the age of 6 months, Titzer went on to develop the Your Baby Can Read (YBCR) series of books and DVDs. YBCR uses pictures and videos to illustrate the meanings of words, and encourages parents and babies to use their kinesthetic sense. This means, for example, helping your child to touch his toes while he looks at the word "toes," or helping him to raise his arms in the air while he looks at the words "arms up." Babies taught in this way soon learn to perform the actions by themselves.

Titzer believes it is considerably easier to learn to read as a baby or preschooler than it is to start learning in first grade. "There's a natural window of opportunity for learning language, and that window begins at birth and goes through [to] around age four years," he says. "That's when it's easier for a baby to learn second languages, sign language, spoken language, or the written form of language." For more on Robert Titzer and his system for teaching babies to read, go to Robert Titzer.

Method...



**TEACHING YOUR BABY TO READ**

**YOUR BABY'S PHYSICAL DEVELOPMENT**

Exhibit A Page 47