# EXHIBIT 3

Exhibit __A__ Page __48__

Dyslexia Debate | Whole Language VS Phonics Learning | Teach Child To Read | Teach ...   Page 1 of 2

HOME | EARLY LEARNING BASICS   PRENATAL EDUCATION   AFTER BIRTH (0-4 M)   TEACHING BABY   FREE DOWNLOADS

BRILLKIDS   BRILLBABY   FORUM   ONLINE STORE   SUPPORT

# Whole Language vs. PHONICS

## The Dyslexia Debate

In response to the widescale damage brought by whole-language reading programs that exclude phonics, educators around the world are increasingly calling for a phonics-first approach to reading instruction. This means helping reading specialists away from a child until he then mastered his ABC's. The average age for learning the alphabet (including the sounds made by each letter) is three to four.

However, for parents who want to stimulate the reading pathways of their children in infancy, there is no need in the child reading words in the wrong direction, or right-to-left. While teaching words, it is still pressure to teach babies to look at the text they're reading from left to right — in turn the arrow means they read the words in YBGR (as Tozer explains):

From left they would all read as red, so blue, and there's almost different look in at time the first to right (The YBGR ONE shows baby words that problem. You read, you're being taught as babies, to learn, read from right to left.

Another way to teach reading directionality from babyhood is to point to the text in books as you read to your child. This is a technique recommended by Katling, who theorizes that some cases of dyslexia could be prevented by fostering "naive reading" — that is, enabling children to absorb the written form of language at the same time as they inherently absorbing the spoken form.

They, perceived children can decode as a key to start teaching complex syntax. When focusing on complex language, children already masters of spoken language by the time they encounter writing. Their brains do not expect to have low-level novelties of language introduced at this point to their development.

A research study published five years prior to Katling's book lends support to this theory. In 2003 scientists from Yale University reported the findings of a longitudinal study into the causes of dyslexia. The researchers had detected two types of the reading disability, with the more serious type (which did not resolve itself by adulthood) attributable to the reading pathways of the brain having improperly connected neural circuitry. The reason for this was found to be an absence of proper stimulation at an early enough age to other words, early reading instruction would effectively prevent the more serious type of dyslexia.

The voice in the head...



TEACHING YOUR
BABY TO READ

YOUR BABY'S
PHYSICAL
DEVELOPMENT

Exhibit __A__ Page __49__

# EXHIBIT 4

Exhibit _A_ Page _50_

Experts: 'Your Baby Can Read' claims overblown - Money - TODAYshow.com          Page 1 of 2

# 'Your Baby Can Read' claims overblown, experts say

It's memorization, not real reading, child development specialists agree

By
**Jeff Rossen and Robert Powell**
NBC News
updated 11/1/2010 3:35:54 PM ET



Ginger Torres was fascinated by the television commercials featuring babies, some as young as 3 months old, reading. Not just words but phrases, like "Touch your ears."

The ads boasted that the remarkable achievement was made possible by "Your Baby Can Read," a program which promised that with the use of flash cards, DVDs, pop-up books and some quality time between parent and child, almost any preschooler could learn to read before they even entered kindergarten.

Ginger Torres wanted that for her 3-year-old daughter, Chloe, so she bought the kit. It was a decision she would come to regret.

"The reason I wanted to buy it is to give her a head start before school," Torres said. "[But] what you're getting is not really what they say."

**Reading or memorization?**
TODAY wanted to find out if the claims were true, so child development experts from the nation's most prestigious institutions of learning were contacted as part of an investigation of the "Your Baby Can Read" program.

More in Money
Mind your money manners this holiday
ConsumerMan: Holiday shopping tips
Your Career: Surviving the office holiday party
What $400K gets you in housing across U.S.
8 tax breaks that anyone can claim

Are those babies really reading?

"No," said Dr. Nonie Lesaux, a child development expert at the Harvard University Graduate School of Education. "They memorize what's on those cue cards ... It's not reading."

"It's an extraordinary manipulation of facts," said Dr. Maryanne Wolf, director of Cognitive Neuroscience at Tufts University.

From coast to coast, TODAY found 10 experts who were all of the same basic opinion: Young children can be made to recognize or memorize words, but the brains of infants and toddlers are just not developed enough to actually learn to read at the level the enticing television ads claim they can.

Related: Preschoolers watching WAY too much TV

There are some remarkable exceptions, like the toddler who surprised Ann Curry on TODAY in 2008 when Curry pulled out a cue card with a word the child had never seen before. She successfully mouthed the word "kangaroo," but experts say the vast majority of children cannot be taught to read until their brains are developed enough.

Video: Watch this baby read

**Dashed hopes**
The problem with programs like "Your Baby Can Read," the experts TODAY contacted say, is that they promise such results routinely, raising hopes that will only be dashed.

"I think it's misleading. I think it's false, and I think it raises false expectations," said Dr. Karen Hopkins, a developmental pediatrician at New York University's Langone Medical Center.

Exhibit ___A___ Page ___57___

Experts: 'Your Baby Can Read' claims overblown - Money - TODAYshow.com          Page 2 of 2

Asked about the experts' collective opinion that children cannot really learn to read until they are 4 or 5 years old, the creator of "Your Baby Can Read" offered a simple explanation.

"They're all wrong," said Dr. Robert Titzer, who calls himself an infant learning expert but actually holds a graduate degree in "human performance" — the study of motor skills.

Titzer told TODAY his program is backed by scientific research. He acknowledged that it starts with memorization, but insisted it leads to reading.

Related?: Fussy newborns may have more troubles later on

"We have a book full of studies that support the use of our program," Titzer said, agreeing to provide the research.

But instead of published research on "Your Baby Can Read," Titzer sent TODAY his own customer satisfaction surveys and general studies about child learning.

    Video: 17-month-old who can read

Titzer stood by his company's claims.

"The baby does learn to read," he said. "My children could read better at age 4 than I could at age, you know, at my age."

Titzer would not disclose how much money he's made off his program, but the company says more than a million "Your Baby Can Read" kits have been sold — some for as much as $200 in stores and online.

Ginger Torres got her money back after complaining to the company, but believes the program is still cashing in on false promises.

    Video: Look who's reading ... a tot!

"I was very upset because I felt so misled," Torres said.



More from TODAYnbc.com

**Is snooping in your spouse's e-mail a crime?**
Leon Walker, 33, who's wife was allegedly having an affair, faces felony charges for reading her e-mail without permission. But his lawyer said that if the prosecution succeeds, they "altier to" kick a "whole more countless" to ness... means a flood of similar cases.

World's first surviving septuplets turn 12

Most shocking TV moments of 2010

2010's best Ambush Makeovers

Your images, tales of East-Coast snow

The experts say the best way to teach your children reading skills is the time-honored one that doesn't cost a dime.

Read to them. Talk to them. Play with them. If a child is having fun, he or she will learn.

110 people recommend this. Be the first of your friends.

Exhibit A   Page 52

# EXHIBIT 5

Exhibit___A___Page___53___

**Los Angeles Times** ARTICLE COLLECTIONS

Too Young to Read?

*Education: Robert Titzer says he can help parents teach even infants how with his videotapes and books. His critics say it's just a chance to sell his wares.*

August 29, 1998 | ELAINE GALE | TIMES STAFF WRITER

Robert Titzer didn't come to Orange County to be invisible.

Before starting his new teaching job at Cal State Fullerton on Wednesday the Ph.D. in human performance was standing in front of a crowd of parents at an Irvine baby store, touting his video "Your Baby Can Read." Copies were available on site, at $13.99 a shot. Unlike most academics, he comes equipped with his own public relations man.

According to Titzer's teachings, infants as young as 9 months can read, as long as parents don't wait too long to start. Say, by about 3 or 4 months of age.

Titzer concedes that his main study for this theory, and for the book and video he sells via his Web site, is based on his own daughters, now 4 and 7. He has published academic papers in the field of human learning, but not about infant reading. And when challenged by the criticisms of other child-development experts who say babies cannot truly read, Titzer acknowledges that what the infants are doing is memorizing the images of a few words, which despite the title of his video cannot be called reading.

"Initially it's simple word recognition," he said, adding that it takes several months for babies to respond to the word images. But he defends its worth. "There is this window of opportunity for learning language and earlier is better."

Titzer's critics abound, but he also has supporters, who say that in some areas of child development he has done solid and important work. A number of fans also showed up at his Irvine talk, parents who like what he has to say and several who snapped up copies of his video.

"He's like a god," said Corinda Vasquez about Titzer. She was one of the parents at Babies R Us who had been using the video with her child. "He can't do any wrong in our eyes."

Her 14-month-old son, Tanner, has been watching the video for almost a year. "I hate to brag, but Tanner is so smart due to Dr. Titzer's teachings," she said.

The 30-minute video flashes more than 50 words in a sequence followed by a pictorial representation of the word. For example, the word "bellybutton" lingers on the screen, with a slow pronunciation, followed by footage of a child pointing to her bellybutton.

Tanner, after a year of watching Titzer's video, responds to all 50 words. "He needs to see more words in order to learn to read new words," said Titzer. "Now he can only read the words in the video. But that's still quite impressive."

Titzer, 38, said that when his daughter was 9 months old, before she could talk, she would recognize words. If he held up a placard with the word "mouth" on it, she'd open her mouth. "Reading is the most important skill that parents can teach their children," he said.

Titzer's academic credibility isn't questioned by his colleagues at Cal State Fullerton, says Roberta Rikli, chair of the college's division of kinesiology and health promotion, who hired Titzer.

"People are mostly quizzical about his work rather than critical," said Rikli. "They are waiting to see if it's for real."

Cal State Fullerton hired Titzer as a part-time adjunct faculty member, where he will be paid $11,000 to teach and conduct research about infant reading to further his theory—and, critics say, his company profits.

"The lack of rigorous scientific review combined with the commercialization of the product leaves me a bit suspect," said Matthew Melved, executive director of the Zero to Three Foundation in Washington D.C., an organization that conducts research on young childhood.

"Perhaps it impresses adults if a very young child can repeat words like an orangutan, but it doesn't promote their long term-brain power," he said.

Titzer rejects the notion that his work is any more commercial than what other academics do. Some professors write textbooks and require students to buy them, he said. "I'm not getting rich off this," he said, and parents can make their own videos or use flash cards.

Melved's concern with Titzer's work is that parents may wind up teaching rote memory-based learning rather than cultivating thinking, thereby undermining a child's long-term progress.

Defending his video, Titzer says Melved's claim that it won't lead to higher thinking skills is ridiculous.

"Babies gain by learning new words, and learning new words helps their thinking skills," he said.

Melved advises parents to resist the hype of rearing an uber-baby. "Being able to read at a young age does not guarantee that a child is going to be successful later," he said.

Another child development expert questioned the use of videotapes to teach very young children.

Exhibit __A__   Page __54__

Robert Titzer - Too Young to Read? - Los Angeles Times                                    Page 2 of 2

"In the first two to three years of life, the best learning occurs in terms of human interaction, not in the form of videotapes," said Dr. Stanley Greenspan, clinical professor of psychiatry and pediatrics at George Washington University Medical School in Washington, D.C.

Titzer said he never meant for his video to replace human interaction. "Most parents don't have 24 hours a day to spend with their babies, unfortunately," he said. "This video can be valuable to stimulate brain development while the parents are busy doing other activities."

Concerns about his methodology and scope haven't kept Titzer's business, Infant Learning Company, from selling 9,000 copies of the tape via the Web site. He doesn't know how many have been sold via bookstores.

"I'm willing to do whatever it takes to help my child," said Carolyn Pinkney of Irvine, who attended Titzer's recent talk.

However, Pinkney is cautious about the benefits of Titzer's video, which she's been watching with her 11-month-old daughter, London.

"Some people say that you shouldn't push a child at this age," she said. "But I'm not going to lock her up, tie her to a chair and make her watch the video."

Titzer moved to California this month after working for two years in a tenure-track job at Southeastern Louisiana University. He has a PhD from Indiana University and a master's degree from Pennsylvania State University. Betty Baker, who hired Titzer at Southeastern Louisiana University, said that while it might be too early for him to draw conclusions in his work on infant reading, she believes he will "have a reputable amount of subjects and data" at some point.

His work on infant memory will be published this year by the Psychological Review in Los Angeles.

According to Robert Bjork, professor at UCLA and editor of Psychological Review, the paper is an "ambitious theory" designed to account for errors that infants make in search tasks. Bjork said he can't speak to Titzer's work on infant reading, which this paper does not address, but that the paper is "a major theoretical contribution."

But Bjork also expressed concern about Titzer's claims of teaching infants to read, saying anxious and ambitious parents are easy prey for the latest educational fad. "Parents are very concerned, so they can be susceptible to these kind of claims," he said.

---

**Los Angeles Times**  Copyright 2010 Los Angeles Times                Index by Keyword | Index by Date | Privacy Policy | Terms of Service

Exhibit____A____Page____55____

# EXHIBIT 6

Exhibit __A__ Page __56__



1 of 1 DOCUMENT

Copyright 2000 Plain Dealer Publishing Co.
Plain Dealer (Cleveland, Ohio)

April 2, 2000 Sunday, FINAL / ALL

SECTION: LIVING; Pg. 4L

LENGTH: 868 words

HEADLINE: EXPERTS DOUBT BRAIN-BOOSTING CLAIMS FOR PRODUCTS, BUT SALES SOAR

BYLINE: By JACQUELINE L. SALMON and JAY MATHEWS; WASHINGTON POST

BODY:

The videotape shows 50 words one by one, while bouncy music plays in the background.

"This says crawling,'" the narrator intones as the word appears onscreen. "Can you say crawling?"

But crawling is an alien concept for many in the video's target audience. They're too young to even sit up.

The videotape, called "Your Baby Can Read!" is designed for children as young as 3 months. And it's just one in a wave of popular new products that claim they can stimulate brain development during the critical first three years of life.

There are also "Brainy Baby" and "Baby Shakespeare" videos. Flashcards and educational software programs for infants. Cassette tapes to teach Spanish, German or French. Classical music CDs to strengthen the neural pathways "linked to abstract and spatial reasoning."

Although most child development specialists say it's doubtful these products will make your child smarter, manu-facturers and toy stores say they're selling briskly.

Robert Titzer, a San Diego public school teacher, said he has sold almost 60,000 of his $15 "Your Baby Can Read!" videos since their 1997 debut.

The Baby Einstein Co., also launched in 1997 by a Colorado at-home mom, had sales of $3.4 million last year and expects to sell $20 million of its videos, CDs and flashcards for babies this year.

Sales of computer software for babies and toddlers have doubled since 1997, according to the market research company PC Data.

Science vs. psychology

The trend has drawn rebukes from many child-development researchers, who say the makers of such products are misinterpreting the findings of neuroscience and causing parents to worry needlessly about their baby's development. Infants and toddlers grow intellectually through everyday experiences rather than because of any particular toy or video, several experts said.

"We do know ... the types of experiences and relationships a baby has in the first few months and years of life are critically important," said Matthew Melmed, executive director of Zero to Three, a nonprofit group that studies young children's development. "But to translate that research into specific products to boost babies' brainpower is really an abomination - a commercial abomination."

Page 2

EXPERTS DOUBT BRAIN-BOOSTING CLAIMS FOR PRODUCTS, BUT SALES SOAR Plain Dealer (Cleveland, Ohio) April 2, 2000 Sunday, FINAL / ALL

The makers defend their claims by citing research studies on brain growth, although the studies did not involve their products. In a few cases, the companies point to scientists they consulted and to awards the products have won from various organizations.

Debra Mills, a neuroscientist at the University of California at San Diego who consulted on the development of "Brilliant Beginnings," a $40 book-and-CD kit for parents interested in "nurturing the genius in your child," acknowledged there are no studies linking brain growth to specific infant activities. Nevertheless, she said, the kit is a useful guide to the enriching experiences a baby needs.

"A lot of parents don't know what to do, even very well-educated people," Mills said. "This just gives a minicourse in human development."

Parents buying the items say they want to make sure their children don't fall behind at a crucial stage in their development.

But educators and researchers say there's no cause for such worrying. Parents who read and play with their babies, respond to their cues and show them affection are giving them all that's needed for optimum brain development, they say. What matters are "things that good parents have known how to do since the beginning of time," said Robert Slavin, an educational researcher at Johns Hopkins University.

Critics of the smart-baby products say those who market them are confusing neurology, the study of the brain as a spongy, grayish lump, and psychology, the study of human behavior.

There are many psychological studies, having nothing to do with brain cells, showing that very young children deprived of normal experiences develop emotional or intellectual disabilities. Meanwhile, neurologists have discovered that the number of synapses, or vital connection points, in the brain increases enormously from before birth to age 3 and begins to drop in early puberty.

But scientists say there's no evidence that this surge of synapses will get an extra boost from particular images, sounds or activities, although brain growth can decrease when children are severely abused or neglected.

"There are no data to show that with each new experience you're adding synaptic connections," said Harry Chugani, director of the PET center at Children's Hospital of Michigan, who has been at the forefront of research into children's brain development.

Although school officials have stressed reading aloud and giving books to children before they start kindergarten, several educators are skeptical about products designed to teach babies how to read. While it's possible for a child under age 2 to look at a printed word, say it aloud and point to an object to demonstrate the word's meaning, they question whether that will make the child a better reader in later years.

The best advice for raising a smart baby, said Robert Pianta, professor of clinical psychology at the University of Virginia, is "relax and enjoy playing with your children."

GRAPHIC: PHOTO BY: WASHINGTON POST; Will these products make baby smarter? It's doubtful, say most child development experts.

COLUMN: BABY SMARTS

LOAD-DATE: April 3, 2000

# EXHIBIT 7

Exhibit __A__ Page __59__

NeuroLogica Blog » Your Baby Can Read – Not!                                                    Page 1 of 8

- Home
- About The Author – Steven Novella, MD
- Topic Suggestions



Jul 02 2009

## Your Baby Can Read – Not!

Published by Steven Novella under Uncategorized
Comments: 17

I have received numerous questions recently regarding the latest infomercial craze called Your Baby Can Read. This is a program that promises to teach infants and toddlers how to read, giving them a jump start on their education. Their website claims:

> A baby's brain thrives on stimulation and develops at a phenomenal pace...nearly 90% during the first five years of life! The best and easiest time to learn a language is during the infant and toddler years, when the brain is creating thousands of synapses every second – allowing a child to learn both the written word and spoken word simultaneously, and with much more ease.

This is mostly true – in fact the first four years of life is not only the best time to learn a language, it is the only time that language itself can be acquired. If a child is completely deprived of exposure to language during this time the neuro-developmental window will close. People can still, of course, learn second languages after the age of four, but it is more difficult and their brains will never be as hard-wired for those second languages as they are for a primary language learned before age four.

But the company goes off the rails of evidence when it conflates language with reading. There is no window of opportunity for reading like there is with language – adults who have never read can learn how to read. And while our brains are pre-programmed to absorb language, reading is more of a cultural adaptation.

The site also abuses evidence when it claims that:

> Studies prove that the earlier a child learns to read, the better they perform in school and later in life.

Yes – but this might have something to do with smarter kids being able to learn to read earlier. Also, smarter parents, or just parents in a more stable and nurturing environment, may be more likely to read to their children early. What we have is correlational data with lots of variables. None of this necessarily means that forcing kids to learn to read early has any advantage.

In general studies of neurological development and education show that forcing kids to learn some task before their brains are naturally ready does not have any advantage. You cannot force the brain to develop quicker or better. In fact, it seems that children need only a minimally stimulating environment for their brain development program to unfold as it is destined to.

This further means that the whole "baby genius" industry for anxious parents is misguided. This is just the latest incarnation of this fiction.

There is another layer to this debate, however – that between phonics and whole word or whole language reading. One school of thought believes that children learn to read by first mastering the sounds that letters make then putting them together (ala hooked on phonics). The second school of thought believes the children read whole works, and therefore can be taught to memorize whole words and the phonemic understanding will come later in its own time.

In recent years the phonics side of this debate has been dominant in the education community. But the whole word group is a vocal minority.

However it also seems that there is an emerging third group who combine the two methods in a practical way. People read by both constructing words from their phonetic parts, an also by memorizing and reading whole words. Have you ever received this e-mail:

> Aroodnicg to rscecrach at Cmabrigde Uinervtisy, it deosn't mttaer in waht ordr the lttaers in a wrod are, the olny ipmroatnt tihng is taht the frist and lsat ltteer are in the rghit pcale. The rset can be a toatl mses and you can sitll raed it woutht pobelrm. Tihs is bseacue the huamn mnid deos not raed ervey ltteer by istlef, but the wrod as a wlohe.

This would seem to support the whole word school of thought. However, we also learn new words by sounding them out, and still have to do

Exhibit ___A___ Page ___60___

NeuroLogica Blog » Your Baby Can Read – Not!                         Page 2 of 8

this for uncommon words. So a blended approach seems practical and is gaining acceptance.

The Your Baby Can Read program is an extreme whole word approach. Infants and toddlers are taught to memorize words, which they can then recognize and name from memory, even before they can understand what they are reading. Critics of this approach claim that this is not really reading, just memorization and association. Some even caution that by taking an extreme whole word approach, phonic understanding can be delayed and the net result can be negative.

Others are critical of this entire approach of forced learning at a very young age. It is more productive, they argue, to give the child a loving supportive environement and let their brain develop as it will. You are far better off spending your time playing with and bonding with your child than engaged in drills or having them sit in front of a video.

There also does not appear to be any evidence that programs like Your Baby Can Read have any long term advantage. Their website does not provide links to any pulished studies to support their claims. Regarding the founder it declares:

> Dr. Titzer's research has been published in scientific journals, including the prestigious Psychological Review.

True -- but misleading as a Pubmed search on Titzer R came up with only two publications, neither of which have anything to do with learning to read. His Wikipedia page claims that he has published no scholarly work on infant reading.

Conclusion

While the background concepts are quite interesting, the bottom line is that we have another product being marketed to the public with amazing claims and no rigorous scientific evidence to back them up. This product also falls into the broader category of gimicky products claiming to make children smarter or more successful academically.

Anxious parents wanting to give their kids every advantage is a great marketing demographic, in that they are easily exploited. But like all gimicky schemes promising easy answers to complex or difficult problems (weight loss, relationships, or academic success) in the end it is likely to be nothing but a costly distraction from more common sense approaches – like just spending quality time with your kids and giving them a rich and save environment. What such products often really provide is a false sense of control.

17 responses so far

17 Responses to "Your Baby Can Read – Not!"

1. # piotron 02 Jul 2009 at 2:38 pm

   Don't you just love when you try to expose something, and Google displays their ads all over your site 😊
   Great article… as always!!!
   I can't stand the competition between parents (not children) hooked on those "magical" learing programs. We don't let our kids play in the first place and we want them to know quantum physics.

2. # PhilBon 02 Jul 2009 at 5:09 pm

   We've been playing these DVDs for our baby at my wife's insistence. Since we didn't actually pay money for them, I haven't sweated it too much, but I have been curious about their real effectiveness.

3. # HHCon 02 Jul 2009 at 8:20 pm

   My mother-in-law's baby could read at 2 and a half years old in the 1950s. Her first son learned the whole word approach and also learned to read from television. He read encyclopedia's by 5 years old. His principal, an Ed.D, used to give him college level texts to check him periodically for comprehension. He would get 99s on the Iowa Basic Reading Skills tests. *

4. # HHCon 02 Jul 2009 at 8:45 pm

   My favorite reading system was a phonetics system that I enjoyed in second grade. Thanks to my grammar school teachers, my parents bought me a pair of well-needed glasses by 10 years old. Those were very helpful indeed.

5. # taustinon 02 Jul 2009 at 8:47 pm

   In my personal experience, the best way to teach children to read is to teach them to *want* to read. My earliest memories are of my older sister reading to me, books she like (some teenage detective stories). I cannot ever remember not loving books, not wanting to read. In the 6th grade, I was told by the school I was reading on a college junior level. And I was an honor role student all through high school, despite being an obnoxious ass.

6. # artfulDon 02 Jul 2009 at 8:49 pm

   Your parents hadn't heard about glasses from another source up until that time?

Exhibit ___A___ Page ___61___

NeuroLogica Blog » Your Baby Can Read – Not!                              Page 3 of 8

7.  ≝ *tmac57on 02 Jul 2009 at 10:46 pm*

    artfulD-"Your parents hadn't heard about glasses from another source up until that time?"
    The same thing happened to me, only it was at age 12. I wasn't even aware that I needed them. Teachers are often the ones to 1st spot a child having vision problems.

8.  ≝ *artfulDon 03 Jul 2009 at 12:16 am*

    I was just curious whether HHC's tendency to drop in the occasional thought apropos of nothing was in some sense hereditary.

9.  ≝ *superdaveon 03 Jul 2009 at 12:57 am*

    I also became a good reader because I loved to read and that only encouraged me to read ever more challenging books. But it's hard to say which came first, did i love reading because I was good at it, or was I good at it because I loved it?

10.  ≝ *artfulDon 03 Jul 2009 at 3:16 am*

    If, as you first said, you became good because you loved it, you have answered the question and will soon need glasses.

11.  ≝ *eiskrystalon 03 Jul 2009 at 3:30 am*

    Or you could just read to your child while showing them the words.

12.  ≝ *mpenningon 04 Jul 2009 at 11:36 pm*

    Actually, the bogus Cambridge University Reading Test invalidates the whole word method. The letters are not "all mixed up." In fact, the consonants are in exact order–kind of like we text message. More on this on a blog I posted on this test at http://penningtonpublishing.com/blog/reading/dick-and-jane-revisit-the-reading-wars/

13.  ≝ *reinzigon 05 Jul 2009 at 11:08 am*

    I am neither convinced nor unconvinced of the efficacy of these sorts of products. It doesn't matter to me, I think they're an extremely bad idea anyway–yes, whether they work or not.

    There is plenty of evidence that early reading does not equal better reading in the long run, nor a greater love of reading. It's just earlier, which seems like a poorly thought through goal, one that makes parents feel impressed with themselves.

    Aside from that, there are broad developmental goals that are important in early childhood that are not necessarily served by drilling children in memorization.

    Lastly, mpenning's comment, while interesting, is simply innaccurate. The consonants are NOT all in exact order, with only the vowels moved around. The first word, Aroednicg, does not satisfy this claim, and neither do quite a number of other words in the passage.

14.  ≝ *HHCon 13 Jul 2009 at 12:05 am*

    Please note that the poster, otto_ 10 July 2009 12:05pm should have his post inserted here instead of Skeptics Affirmation. The post is relevant to Your Baby Can Read – Not.

15.  ≝ *mpenningon 13 Jul 2009 at 5:58 pm*

    As an MA reading specialist, I've seen some crazy fads come and go. My favorite has to be the developmental reading strategy that was quite en vogue back in the 1970s and 1980s. It's assumption was that poor readers had missed a developmental stage along the way and that the best remediation was to revisit that stage to ensure that all of the synapses were properly hard-wired.

    The supposed correlate was that poor readers tended to never crawl as older babies. The reading therapy? You guessed it; poor readers were put on all fours and made to crawl.

    In your article, you mention the both/and, rather than the either/or option for integrating phonics and whole word learning. I tend to agree; however, the problem-solving approach is important in reading, i.e., readers should first attempt to decode (phonics) and then adjust to whole word (sight words) if the words are not phonetically regular.

    I have written articles on both sides of the coin: Phonics: http://penningtonpublishing.com/blog/reading/top-ten-reasons-to-teach-phonics/ and Whole Words: http://penningtonpublishing.com/blog/reading/how-to-teach-sight-words/

16.  ≝ *John Rullmanon 16 Sep 2009 at 3:16 pm*

    Dear Dr. Novella,

Exhibit ___A___ Page _62_

NeuroLogica Blog » Your Baby Can Read – Not!                                    Page 4 of 8

As a fan of the SGU podcast from the beginning (well, for years – I've "caught up" from the beginning), I believe the skeptical movement can provide valuable instruction to people who do not ordinarily apply sound reasoning principles to the the news and marketing information to which they are continuously exposed. I actually don't care much for the notion of a skeptical "movement;" I think that tends to marginalize an intellectual process that should be characterized as common, right-headed, rational, sensible reasoning (still working on the winning catch-phrase). In any case, applying a skeptical eye to sales pitches is certainly a necessity in our society where, for the sake of turning a buck, things are often not what they are presented to be.

However, I believe your blog post fails the common consumer who would look to an authoritative voice in the skeptical movement for sound guidance in their consideration of Dr. Titzer's "Your Baby Can Read" product. You flirt with the real issue to the consumer, but ultimately remain primarily focused on the call-to-arms issue of the skeptical crusader. Worse than that, though, is that you seem to be willing indict the product with no more, or perhaps less, evidence than Dr. Titzer has available in making his claims. And worst of all – if you are advocating the adoption of rational thought processes in everyday decision-making, should you be including common rhetoric in the making of your case? I have a great deal of respect for your knowledge and your discipline of reason; I don't think your commentary in this case lives up to the standard that I find you to generally uphold.

Parents considering this product seek the answer, that suits their circumstances, to a singular question: "Is this product a worthwhile investment?" One of the issues to be considered in making this determination is "is there any published scholarship or valid scientific study to support the claims of product benefit?" But to confuse the latter question with the former as being the real issue to the consumer would be erroneous, and is by my observation an error too often committed in the name of the skeptical movement.

I am the father of a nine month old. My wife and I saw the infomercial for the "Your Baby Can Read" program. I consider myself to be a very skeptical person and a hard sell for the incredible claims of the typical infomercial. Having scrutinized the fine print of the trial evaluation offer, we decided that for the risk we would be taking, the product was worth a look. We are a week into the program, and our observations so far would be interesting from an anecdotal standpoint, but not what would constitute scientific evidence. The jury is still out on whether we will continue past the trial period, but early indications are promising.

During this trial interval, I am searching for valid evidence of the product's effectiveness outside of my own observation, and other useful perspectives that would contribute to my own decision-making. Your blog addresses an important question – the lack of published studies or other scientific evidence demonstrating the program's benefit makes the program's value more difficult to discern, if it exists at all. But, that there is an absence of studies that provide any finding of product efficacy means that scientific research has nothing to say on the matter one way or another. Therefore, I don't find a reasonable route to the absolute conclusion that the program does not have benefit.

I do not see where the company has made claims of benefit based on a "window of opportunity" for reading. Having examined the parents' guides for the program, I find that the company claims that an early start at learning to read is advantageous for maximizing ultimate reading potential, but not an opportunity for any level of reading ability will be missed. It appears that the "window of opportunity" interpretation was your own leap (I recall the discussion of the concept as it relates to language from a past SGU podcast).

I entirely agree that the marketing of the product incorporates some breakdowns of rational conclusion. The company fails to validate their reference to "studies" that would demonstrate long-term school or life performance advantage so as to allow a critique of the studies' design. And I would prefer to not see vague references to Dr. Titzer's scientific publishing if it is not relevant to the subject at hand. However, I think it is important to recognize the distinction between shortcomings in the marketing of a product and the fundamental merits of the product itself. The former poses a challenge to the determination of the latter, but we should not be led to an unsupported conclusion about any product by objections we may have to marketing technique. And in this case, I certainly don't see the egregious marketing crimes being committed that would lead to question of the basic integrity or ethics of the company or its principals.

"No scientific evidence of long term benefit" would be a reasonable skeptics finding to be made from the facts available. Disturbingly, though, you have peppered your commentary with numerous remarks ill-suited to a reasonable critique of the product claims or other available data:

- "… forcing kids to learn some task before their brains are naturally ready … ." Forcing? This is not consistent with the instructional guidance for the product, and inflammatory on your part. Has there been a determination that the brain of a toddler is not "naturally ready" to begin learning to read? If so, please elaborate.

- "You cannot force the brain to develop quicker or better." This is an apparent misread of the core claim of the program, that being that the time interval concurrent with explosive brain development is an advantageous time to begin teaching a child to read, not that you should teach your child to read at this time to stimulate explosive brain development. (An argument could be made that the latter is an implication of the program's marketing, and such an implication would be certainly be a marketing overreach, but this is not the issue that is of concern to the parent considering the merit of the product.)

- "… the whole 'baby genius' industry for anxious parents is misguided." Not sure how you would classify this logical fallacy or rhetorical maneuver, but it is untoward of you to imply that any parent who is attentive to the educational potential of their child is "anxious." Nor do I think it is exemplary skepticism to uniformly indict all products that would serve early child development objectives with a blanket indictment of the entire industry, or to identify them with a condescending label.

- "The Your Baby Can Read program is an extreme whole word approach" [sic]. Extreme? Other than for rhetorical effect, I don't see the validity of any characterization other than a "standard" or "regular" whole word approach. The program presents a singular

Exhibit _____A_____ Page _____63_____

approach, but in the materials, Dr. Titzer actually espouses a blended approach, which would "seem practical" by your reckoning.

– "Critics … claim," "some even caution," "others are critical … of forced learning … ." There is a great deal of generalized negative implication, but little or no reliable fact in these remarks. Don't we as skeptics have an obligation to live up to the same standards for quality argument that we demand of the objects of our criticism?

As a fan of you and your advocacy of critical thinking, it is difficult for me to read the concluding statement of your blog post. You may not have had the opportunity to respond to your audience's inquiry with the benefit of an adequate examination of the product, but you should resist the inclination to pass such judgments without due diligence. The product does not offer an easy solution to the objective – the program involves a detailed process that proceeds over many months. How do you get to "gimicky?" The claims are not so amazing – you put in the work to teach a child to read, and they learn to read (in the generation in which I learned to read, a kindergartner that can read would have been pretty surprising). The process, properly applied, actually provides rewarding interaction between parent and child (that much is clear in the first week, before any indication of reading success is seen). Your entire conclusion is a swing and a miss.

Bottom line is that we are presented with a product that offers compelling benefits in the context of a somewhat revolutionary educational concept, for which there is no scientific finding available that speaks one way or another on the product's efficacy. So we are left to consider a product based on a plausible notion and that purports to serve a worthy objective – improving the learning potential of children. As an "attentive" parent and an alert skeptic, I would say this product bears further examination. Unless valid scientific study emerges that addresses the product or the underlying principles, sound skepticism has little more to say.

With best regards,

John Rullman

17.  : *Steven Novella on 16 Sep 2009 at 6:51 pm*

John,

Thanks for your thoughtful feedback. However, I disagree with your reading of my post. Essentially, you seem to agree with my core point – the company makes claims not backed by adequate evidence, but disagree with the form of my critique.

For example, you object to my use of the term "force" – but you misread my usage. This is not meant to be emotive – I use the term "force" to mean that you can make something happen ahead of schedule.

You also misread my use of the word "extreme" – again, this was used specifically to mean one end of a spectrum. I understand that the instructions include other techniques, but the core of the program and the way it is sold is at one end of the reading strategy spectrum.

Further, I disagree that all we can say is that this product lacks evidence. We do have a body of neurological research that indicates that as people mature they reach their intellectual potential, as long as they do no have a deprived environment. Doing extra or early work does not improve long term outcomes. So this is a reasonable default position unless there is evidence to suggest otherwise – which you agree, there isn't.

And to clarify – I am not talking about fund of knowledge, but rather intellectual skills, like reading.

If the program encourages quality time between parent and child, fine. But then you could do this without spending any money on a program – which is what I recommended.

I also did not mean the term "anxious" to be derogatory. I am an anxious parent – all parents should be appropriately anxious. Anxiety is an adaptive trait. Appropriately concerned, anxious, motivated parents are easy to exploit by making them feel as if they are missing out if they don't buy some product.

So I completely stand by my characterization that this product makes unsubstantiated claims, lacks plausibility, is conceptually problematic, and very deliberately exploits their target demographic.

• Search for:                    [ Search ]

. **Recent Posts**

   o Artificial Photosynthesis
   o The Spinning Girl Illusion Revisited
   o The Uncanny Valley
   o Scientific Heresy
   o Medical Myths – Now Available

. **Recent Comments**

- o cwfong on Scientific Heresy
- o sonic on Scientific Heresy
- o locutusbrg on Artificial Photosynthesis
- o tmac57 on The Spinning Girl Illusion Revisited
- o mufi on Artificial Photosynthesis

. **Affiliated Sites**

- o The New England Skeptical Society
- o The Skeptics Guide to the Universe Weekly Science Podcast

. **General Science Blogs**

- o Astiology
- o Pharyngula
- o Scientific American Blog

. **Skeptical Blogs**

- o Bad Astronomy
- o Denialism
- o Memoirs of a Skepchick
- o Respectful Insolence
- o Science Based Medicine
- SGU Blog – The Rogues Gallery
- o SkepticBlog

. **Skepticism**

- o James Randi Educational Foundation
- o Skepchick

Visit the Chicago Neurology Department of Northshore





TOP NEUROSCIENCE BLOGS
TOP RATIONALITY BLOGS

. **Pages**

- o About The Author – Steven Novella, MD
- o Topic Suggestions

. **Categories**

- o Astronomy

Exhibit __A__ Page __65__

- autism
- Blogroll
- Conspiracy Theories
- Creationism/ID
- Education
- Evolution
- General
- General Science
- History of Science/Medicine
- Legal Issues
- Logic/Philosophy
- Neuroscience
- Paranormal
- Pseudoscience
- Religion/Miracles
- Science and Medicine
- Science and the Media
- Skepticism
- Technology
- UFO's / Aliens

### Meta

- Register
- Log in
- Entries RSS
- Comments RSS
- WordPress.org

### Archives

- December 2010
- November 2010
- October 2010
- September 2010
- August 2010
- July 2010
- June 2010
- May 2010
- April 2010
- March 2010
- February 2010
- January 2010
- December 2009
- November 2009
- October 2009
- September 2009
- August 2009
- July 2009
- June 2009
- May 2009
- April 2009
- March 2009
- February 2009
- January 2009
- December 2008
- November 2008
- October 2008
- September 2008
- August 2008
- July 2008
- June 2008
- May 2008
- April 2008
- March 2008
- February 2008
- January 2008
- December 2007
- November 2007
- October 2007

Exhibit __A__ Page __66__

NeuroLogica Blog » Your Baby Can Read – Not!

- o September 2007
- o August 2007
- o July 2007
- o June 2007
- o May 2007
- o April 2007
- o March 2007
- o February 2007
- o January 2007
- The advertisements below do not necessarily reflect the views of this blog, its author, or host.

Ads by Google

**Your Baby Can Read**
The only learning
system with proven
results. See babies
reading.
www.YourBabyCanRead.com

**San Jose Coupons**
1 ridiculously huge
coupon a day. Like
doing San Jose at
90% off!
www.Groupon.com/San-Jose

**Teach Your Child To
Read**
A Breakthrough In
Learning To Read!
Ages 3 to 7. Free 14-
Day Trial.
www.ReadingEggs.com

**Child Evaluations**
Comprehensive
psychological
evaluations &
educational advocacy.
www.praxcenter.com

**Baby BumbleBee
Video**
Help Your Baby
Develop Language
With Videos, DVDs &
Flashcards.
www.BabyBumbleBee.com

Site Admin | Free WordPress ThemeNeuroLogica Blog Copyright © 2010 All Rights Reserved .

12/28/2010

Exhibit __A__ Page __67__

# EXHIBIT 8

## BUILDING BABIES` BRAINS

When Audrey LeVine`s son was 3 months old, she set up his bouncer seat In front of the television and popped in a videotape called "Baby Mozart."

"The tapes are supposed to make him develop and become more educated more quickly," says the Manhasset, N.Y., mom. "They have different children`s toys moving In different sequences. I was hoping he would be stimulated by the shapes."

But Max wasn't interested.



"After a few minutes he would start fussing," says LeVine, a part-time attorney, who watched the tape six times with her son, who is now 11 months old. "He could cry, and he's not a crier. He wouldn't look at the television."

LeVine also has a videotape featuring classical music by Bach and one called "Baby Einstein," which matches songs and nursery rhymes in Hebrew, Japanese, German and Spanish to child-friendly visuals. (One Web site that sells the video, www.smart-babies.com, suggests that It can increase a child's language power.)

Article continues below

advertisement

Such videos are among a growing trend of baby products claiming to stimulate brain growth during the first three years of life. Some -- such as "Your Baby Can Read!" -- aim to Introduce babies as young as 3 months to the beginning concepts of reading. Others, Including "Brainy Baby," go so far as.to suggest the tapes can play a role in the development of a baby's right and left brain. There is also a "Baby Shakespeare" video and board book.

But that`s not all. Baby-specific flash cards can be purchased or downloaded to your computer from www.thesmartbaby.com, and "developmental" toys are a dime a dozen. Black-and-white shapes are designed to stimulate newborns, and colorful patterns are designed to maintain babies' interest.

LeVine now believes she introduced Max to the tapes at too early an age and plans to try again when he's older. And she isn't the only parent trying to boost her child's brain power in the early stages of life. Even the governor of Georgia suggested that all babies born in his state be given hourlong packages of classical music CDs and tapes in an attempt to foster the connection between music and math.

Laurie Seagal, an early childhood development expert in Williston Park, N.Y., says these products can serve a purpose. "Some of it is about marketing and money, but some of it is valid," she says. "Some of them will create an interest in the child, will touch upon something we're unaware of."

The toys and videotapes may "please the baby, stimulate intellectual growth," Segal says. "But I don`t think a parent should bank on these items, because no given item is going change the basic makeup of the child."

There's widespread acceptance of the data demonstrating that children experience rapid brain growth between birth and age 3. In fact, research shows that stimulating babies' brains during this crucial growth period can have a lifelong impact on their ability to learn. However, it troubles some child development experts that companies use the research to convince parents to buy their products.

And, these days, babies seem to be getting more attention than ever before.

Still, many child development experts continue to scoff at what they see as obvious marketing ploys, and what irritates them most Is the purported link between Mozart and increased intelligence and cognitive skills.

The popular "Baby Mozart" tape and others like it were developed after studies at the University of California at Irvine found a correlation between listening to Mozart and an increased ability in math, science and the performing arts. Since the

Exhibit __A__ Page __69__

research was conducted in 1993 and the phrase ``the Mozart effect'' was coined, a slew of baby products -- promoting the theory that classical music can stimulate an infant's brain development, sometimes even before birth -- have become available.

``There is no research that playing music to an infant changes their brain organization in any way that makes them smarter,'' says William H. Staso, a California educational psychologist who has written ``Brain Under Construction'' (Great Beginnings Press, $19.95) and ``Neural Foundations: What Stimulation Your Baby Needs to be Smart: Birth Through Seven Months'' (Great Beginnings, $19.95).

``The Mozart effect'' is based on an experiment with college students who, after listening to the composer, were able to improve their memory for a short period of time. A second study at Irvine, in 1997, showed that giving music instruction to preschoolers improved their spatial skills.

``But for infants,'' he says, ``just listening isn't going to make a difference.''

According to Matthew Melmed, executive director of Zero to Three, a Washington, D.C., nonprofit organization that focuses on the first years of life, ``I take the position, based on extensive research we have on the early years of life, that most of these products are useless. Some can even be harmful. Babies don't need a flat, one-dimensional screen that isn't responding to them. What babies need are relationships with a small number of adults who know them, who are capable of reading and responding to their cues in a sensitive fashion. Products that are designed to essentially have them not interact with adults will do nothing toward that. You can't buy a relationship.''

Doris Fromberg, director of early childhood teacher education at Hofstra University in Hempstead, N.Y., agrees.

``Secure attachment to a significant adult or adults is very central to the growth process. I don't know that some commercial video can do that for you. The other big piece that helps children in infancy is they are really saturated by those attached adults with rich language experience in the context of everyday things they do. I call it verbal harmony. When a child is doing something, the parent says, `Oh, you're eating with a spoon, or pushing the green peas off the table. Oh, you've dropped the teddy bear.' Talking about what the baby is doing helps language develop very strongly.''

June Manicone of Great Neck, N.Y., has been doing that with her daughter, Alexandria, who turned 2 in February, and believes her daughter seems more advanced than other children her age. Manicone says she has been making sounds to Alexandria, talking to her and holding her close to her since the day she was born.

``I put music in the day she came home. I sing lullabies to her,'' she said.

And the 32-year-old stay-at-home mom has never stopped engaging her child in conversation. ``I always told her what I was doing, even when I was cooking. She'd want attention, and I'd talk to her. I read to her constantly. She's actually reading books with me. She remembers the pictures. I'll read and stop, and she'll give the next answer. She already knows her shapes, her colors. She talks in full sentences. She's learning.''

(Debbe Geiger is a free-lance writer specializing in health and science. She is based on Long Island, N.Y.)

(c) 2000, Debbe Geiger

Author: Debbe Geiger

# EXHIBIT 9

Exhibit *A* Page *71*

## Read!

### Terms of Use

These Terms of Use ("Terms") are between Your Baby Can, LLC ("Your Baby Can Read!") and you ("You"), the person using Your Baby Can Read! products, materials, website and Customer Services department ("Services"). Individuals must be 18 years of age or older to use this website ("Site") and you warrant that you are 18 years of age or older. We occasionally change these Terms, so please refer to the Terms of Use page on our website (www.yourbabycanread.com) for changes. BY USING AND/OR VISITING THIS SITE, YOU SIGNIFY YOUR ASSENT TO BOTH THESE TERMS AND CONDITIONS (the "Terms of Use") AND THE TERMS AND CONDITIONS OF OUR PRIVACY POLICY, WHICH ARE PUBLISHED AT http://www.yourbabycanread.com/privacy.php, AND WHICH ARE INCORPORATED HEREIN BY REFERENCE. If you do not agree to any of these terms, please do not use the Site.

### Site Access

YOUR BABY CAN READ! hereby grants you the limited, non-sublicensable right and permission to use the Site as set forth in these Terms of Use, provided that: (i) your use of the Site as permitted is solely for your personal, noncommercial use; (ii) you will not copy or distribute any part of the Site in any medium without YOUR BABY CAN READ!'s prior written authorization; (iii) you will not alter or modify any part of the Site; and (iv) you will otherwise comply with the terms and conditions of these Terms of Use. Except for the limited license granted to you hereunder, you are not conveyed any other right or license by implication, estoppel, or otherwise in or under any patent, trademark, copyright, or proprietary right of YOUR BABY CAN READ! or any third party.

In order to access some features of the Site, you may be required to create an account. You may never use another person's account without the account holder's express permission. When creating your account, you must provide accurate and complete information. You are solely responsible for the activity that occurs on your account, and you must keep your account password secure. You must notify YOUR BABY CAN READ! immediately of any breach of security or unauthorized use of your account. Although YOUR BABY CAN READ! will not be liable for your losses caused by any unauthorized use of your account, you may be liable for the losses of YOUR BABY CAN READ! or others due to such unauthorized use of your account.

You agree not to use or launch any automated system, including without limitation, "robots," "spiders," "offline readers," and the like, that accesses the Site in a manner that sends more request messages to the YOUR BABY CAN READ! servers in a given period of time than a human can reasonably produce in the same period by using a conventional on-line web browser. Notwithstanding the foregoing, YOUR BABY CAN READ! grants the operators of public search engines permission to use spiders to copy materials

Exhibit A Page 72

from the site for the sole purpose of creating publicly available searchable indices of the materials, but not caches or archives of such materials. YOUR BABY CAN READ! reserves the right to revoke these exceptions either generally or in specific cases. You agree not to collect or harvest any personally-identifiable information from the Site, including account names, nor to use the communication systems provided by the Site for any commercial solicitation purposes. You agree not to solicit, for commercial purposes, any users of the Site with respect to their User Submissions.

## Modification of Service

Your Baby Can Read! reserves the right at any time and from time to time to modify or discontinue, temporarily or permanently, the Service (or any part thereof) with or without notice. You agree that Your Baby Can Read! shall not be liable to you or to any third party for any modification, suspension or discontinuance of the Service.

## Privacy Policy

Registration, membership and certain other information about you is subject to our Privacy Policy. For more information, see our full Privacy Policy at http://www.yourbabycanread.com/privacy.php

## Limitations

The Service is limited to individuals 18 years and older. Your order is solely for personal use and not for re-distribution. You agree that you will not access, reproduce, duplicate, copy, sell, resell or exploit for any commercial purpose, the Services or any portion thereof. Your Baby Can Read! will not be liable for any loss or damage arising from such activities, and Your Baby Can Read! reserves the right to terminate access to the

Service, with or without notice.

## Guarantee

Each Product you purchase from Your Baby Can Read! comes with a 30 day money back guarantee. If you are not completely satisfied with a Product, simply return the unused portion within 30 days from the date you received your Product. For Products purchased on an auto-ship plan, the guarantee only applies to first-time shipments. The money back guarantee does not apply to subsequent purchases of the same Product. Before a refund can be issued, Customers are required to contact Your Baby Can Read! at [1-888-READ-888] for return authorization and instructions. Proof of purchase is required. Shipping and processing charges are nonrefundable. Your Baby Can Read! will issue a refund for the original Product purchase price, less shipping and handling, within 10 to 15 business days (or 1 billing cycle) after receipt of your return Product.

## Use of Information and Ideas Submitted

Exhibit _A_ Page _73_

You hereby acknowledge and agree that Your Baby Can Read! is free to use any comments, information, ideas, concepts, reviews, techniques or other information contained in any communication you may send to Your Baby Can Read! or any communication you may have with a Your Baby Can Read! representative (the "Ideas"), and Your Baby Can Read! shall have no obligation to compensate you in any way for the Ideas, even if the Ideas are used by Your Baby Can Read! for commercial purposes, including but not limited to use by Your Baby Can Read! for developing, manufacturing and marketing products and creating, modifying or improving Your Baby Can Read! or other products, services or Websites affiliated with Your Baby Can Read!. Furthermore, by posting or displaying any such Ideas on our site, you hereby grant to us a nonexclusive, royalty-free license to display, use, reproduce and/or modify the Ideas.

## Disclaimer of Warranties

YOU AGREE THAT YOUR USE OF THE SITE SHALL BE AT YOUR SOLE RISK. TO THE FULLEST EXTENT PERMITTED BY LAW, YOUR BABY CAN READ!, ITS OFFICERS, DIRECTORS, EMPLOYEES, AND AGENTS DISCLAIM ALL WARRANTIES, EXPRESS OR IMPLIED, IN CONNECTION WITH THE SITE AND YOUR USE THEREOF. YOUR BABY CAN READ! MAKES NO WARRANTIES OR REPRESENTATIONS ABOUT THE ACCURACY OR COMPLETENESS OF THIS SITE'S CONTENT OR THE CONTENT OF ANY SITES LINKED TO THIS SITE AND ASSUMES NO LIABILITY OR RESPONSIBILITY FOR ANY (I) ERRORS, MISTAKES, OR INACCURACIES OF CONTENT, (II) PERSONAL INJURY OR PROPERTY DAMAGE, OF ANY NATURE WHATSOEVER, RESULTING FROM YOUR ACCESS TO AND USE OF OUR SITE, (III) ANY UNAUTHORIZED ACCESS TO OR USE OF OUR SECURE SERVERS AND/OR ANY AND ALL PERSONAL INFORMATION AND/OR FINANCIAL INFORMATION STORED THEREIN, (IV) ANY INTERRUPTION OR CESSATION OF TRANSMISSION TO OR FROM OUR SITE, (IV) ANY BUGS, VIRUSES, TROJAN HORSES, OR THE LIKE WHICH MAY BE TRANSMITTED TO OR THROUGH OUR SITE BY ANY THIRD PARTY, AND/OR (V) ANY ERRORS OR OMISSIONS IN ANY CONTENT OR FOR ANY LOSS OR DAMAGE OF ANY KIND INCURRED AS A RESULT OF THE USE OF ANY CONTENT POSTED, EMAILED, TRANSMITTED, OR OTHERWISE MADE AVAILABLE VIA THE SITE. YOUR BABY CAN READ! DOES NOT WARRANT, ENDORSE, GUARANTEE, OR ASSUME RESPONSIBILITY FOR ANY PRODUCT OR SERVICE ADVERTISED OR OFFERED BY A THIRD PARTY THROUGH THE SITE OR ANY HYPERLINKED SITE OR FEATURED IN ANY BANNER OR OTHER ADVERTISING, AND YOUR BABY CAN READ! WILL NOT BE A PARTY TO OR IN ANY WAY BE RESPONSIBLE FOR MONITORING ANY TRANSACTION BETWEEN YOU AND THIRD-PARTY PROVIDERS OF PRODUCTS OR SERVICES. AS WITH THE PURCHASE OF A PRODUCT OR SERVICE THROUGH ANY MEDIUM OR IN ANY ENVIRONMENT, YOU SHOULD USE YOUR BEST JUDGMENT AND EXERCISE CAUTION WHERE APPROPRIATE.

Terms of Use

### Limitation of Liability

IN NO EVENT SHALL YOUR BABY CAN READ!, ITS OFFICERS, DIRECTORS, EMPLOYEES, OR AGENTS, BE LIABLE TO YOU FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES WHATSOEVER RESULTING FROM ANY (I) ERRORS, MISTAKES, OR INACCURACIES OF CONTENT; (II) PERSONAL INJURY OR PROPERTY DAMAGE, OF ANY NATURE WHATSOEVER, RESULTING FROM YOUR ACCESS TO AND USE OF OUR SITE; (III) ANY UNAUTHORIZED ACCESS TO OR USE OF OUR SECURE SERVERS AND/OR ANY AND ALL PERSONAL INFORMATION AND/OR FINANCIAL INFORMATION STORED THEREIN; (IV) ANY INTERRUPTION OR CESSATION OF TRANSMISSION TO OR FROM OUR SITE; (IV) ANY BUGS, VIRUSES, TROJAN HORSES, OR THE LIKE, WHICH MAY BE TRANSMITTED TO OR THROUGH OUR SITE BY ANY THIRD PARTY; AND/OR (V) ANY ERRORS OR OMISSIONS IN ANY CONTENT OR FOR ANY LOSS OR DAMAGE OF ANY KIND INCURRED AS A RESULT OF YOUR USE OF ANY CONTENT POSTED, EMAILED, TRANSMITTED, OR OTHERWISE MADE AVAILABLE VIA THE YOUR BABY CAN READ! SITE, WHETHER BASED ON WARRANTY, CONTRACT, TORT, OR ANY OTHER LEGAL THEORY, AND WHETHER OR NOT THE COMPANY IS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE FOREGOING LIMITATION OF LIABILITY SHALL APPLY TO THE FULLEST EXTENT PERMITTED BY LAW IN THE APPLICABLE JURISDICTION. YOU SPECIFICALLY ACKNOWLEDGE THAT YOUR BABY CAN READ! SHALL NOT BE LIABLE FOR USER SUBMISSIONS OR THE DEFAMATORY, OFFENSIVE, OR ILLEGAL CONDUCT OF ANY THIRD PARTY AND THAT THE RISK OF HARM OR DAMAGE FROM THE FOREGOING RESTS ENTIRELY WITH YOU. THE SITE IS CONTROLLED AND OFFERED BY YOUR BABY CAN READ! FROM ITS FACILITIES IN THE UNITED STATES OF AMERICA. YOUR BABY CAN READ! MAKES NO REPRESENTATIONS THAT THE YOUR BABY CAN READ! SITE IS APPROPRIATE OR AVAILABLE FOR USE IN OTHER LOCATIONS. THOSE WHO ACCESS OR USE THE YOUR BABY CAN READ! SITE FROM OTHER JURISDICTIONS DO SO AT THEIR OWN VOLITION AND ARE RESPONSIBLE FOR COMPLIANCE WITH LOCAL LAW.

Some jurisdictions do not allow the exclusion or limitation of incidental or consequential damages. In such jurisdictions our liability, if any, shall be limited to the fullest extent permitted by law.

### Indemnification

Upon a request by Your Baby Can Read!, you agree to defend, indemnify, and hold harmless Your Baby Can Read! and its affiliates, and their employees, contractors, agents, representatives, officers and directors from all liabilities, claims, and expenses, including without limitation attorneys fees that arise from your use or misuse of this site. Your Baby Can Read! reserves

12/28/2010

the right, at its own expense, to assume the exclusive defense and control of any matter otherwise subject to indemnification by you, in which event you will cooperate with Your Baby Can Read! in asserting any available defenses.

**Intellectual Property Rights**

Except for User Submissions (as defined below), all content on the Site is the property of YOUR BABY CAN READ! and/or its licensors and is subject to copyright, trademark and other intellectual property rights under United States and foreign laws and international conventions, including without limitation, the design, source code, text, software, scripts, graphics, images, photographs, sounds, music, videos, video and audio files, interactive features and the like, and the selection, arrangement, structure, coordination, and "look and feel" thereof (collectively the "Content"), together with the trademarks, service marks and logos contained therein ("Marks").

All YOUR BABY CAN READ! product names, slogans, graphics, page headers, logos, button icons, and scripts on the Site are either trademarks or service marks, in the United States and other countries, of YOUR BABY CAN READ! or its affiliates, subsidiaries, suppliers and licensors and are the property of YOUR BABY CAN READ!. Unauthorized use, whether or not such use is tied to any commercial endeavors, is strictly prohibited. Your Baby Can Read! trademarks may not be used in connection with any product or service that is not Your Baby Can Read!, in any manner that is likely to cause confusion among customers or in any manner that disparages or discredits Your Baby Can Read!. You may not use any metatags or any other "hidden text" utilizing YOUR BABY CAN READ! or any other name, trademark, service mark or product name of YOUR BABY CAN READ! without our permission. In addition, all page headers, custom graphics, button icons, and scripts are subject to copyright protection for the benefit of YOUR BABY CAN READ! and/or are the service marks, trademarks and/or trade dress of YOUR BABY CAN READ!, and may not be copied, imitated, or used, in whole or in part, without our prior written permission. Reference on the Site to any third party-owned products, services, processes, or other information, whether by trade name, trademark, manufacturer, supplier, or otherwise, does not constitute or imply endorsement, sponsorship or recommendation thereof by us. All other trademarks not owned by Your Baby Can Read!, its affiliates or its subsidiaries that appear on this site are the property of their respective owners, who may or may not be affiliated with, connected to, or sponsored by Your Baby Can Read!. Content on the Site is provided to you AS IS for your information and personal use only and may not be used, copied, reproduced, distributed, transmitted, broadcast, displayed, sold, licensed, or otherwise exploited for any other purposes whatsoever without the prior written consent of the respective owners.

YOUR BABY CAN READ! reserves all rights not expressly granted in and to the Site and the Content. You agree not to engage in the use, copying, or distribution of any of the Content other than expressly permitted herein, including any use, copying, or distribution of User Submissions of third parties obtained through the Site for any commercial purposes. You further

Exhibit __A__ Page __76__

agree not to make derivative uses of the Site or the Content, or to use, frame
or utilize framing techniques to enclose any portion of the Site, including the
images found on the Site or any text or layout/design of any page or form
contained on a page of the Site. If you download or print a copy of the
Content for personal use, you must retain all copyright and other proprietary
notices contained therein. You agree not to circumvent, disable or otherwise
interfere with security related features of the Site or features that prevent or
restrict use or copying of any Content or enforce limitations on use of the Site
or the Content therein.

**User Submissions**

A. The Site may now or in the future permit the submission of videos,
photographs or other communications submitted by you and other users
("User Submissions") and the hosting, sharing, and/or publishing of such
User Submissions. You understand that, whether or not such User
Submissions are published, YOUR BABY CAN READ! does not guarantee
any confidentiality with respect to any submissions.

B. You shall be solely responsible for your own User Submissions and the
consequences of posting or publishing them. In connection with User
Submissions, you affirm, represent, and/or warrant that: (i) you own or have
the necessary licenses, rights, consents, and permissions to use and authorize
YOUR BABY CAN READ! to use all copyright, trademark, patent, trade
secret or other proprietary rights in and to any and all User Submissions to
enable inclusion and use of the User Submissions in the manner contemplated
by the Site and these Terms of Use; and (ii) you have the written consent,
release, and/or permission of each and every identifiable individual person in
the User Submission to use the name or likeness of each and every such
identifiable individual person sufficient to enable inclusion and use of the
User Submissions in the manner contemplated by the Site and these Terms of
Use.

C. You will retain all of your ownership rights in your User Submissions.
However, by submitting the User Submissions to YOUR BABY CAN
READ!, you hereby grant YOUR BABY CAN READ! a worldwide, non-
exclusive, royalty-free, sublicenseable and transferable license to use,
reproduce, distribute, prepare derivative works of, display, and perform the
User Submissions in perpetuity in connection with the Site and YOUR
BABY CAN READ!'s (and its affiliates', successors' and assigns')
businesses, including without limitation: (i) for promoting and redistributing
part or all of the Site (and derivative works thereof) in any media formats and
through any media channels; and (ii) for inclusion in products and services to
be marketed commercially by YOUR BABY CAN READ! (by way of
example only, films, television programs, infomercials, interactive games,
Internet sites, books and collectibles). You also hereby grant each user of the
Site a non-exclusive license to access your User Submissions through the
Site, and to use, reproduce, distribute, prepare derivative works of, display
and perform such User Submissions as permitted through the functionality of
the Site and under these Terms of Use.

Exhibit __A__ Page __77__

D. In connection with User Submissions, you further agree that you will not: (i) submit material that is copyrighted, protected by trade secret or otherwise subject to third party proprietary rights, including privacy and publicity rights, unless you are the owner of such rights or have permission from their rightful owner to post the material and to grant YOUR BABY CAN READ! all of the license rights granted herein; (ii) publish falsehoods or misrepresentations that could damage YOUR BABY CAN READ! or any third party; (iii) submit material that is unlawful, obscene, defamatory, libelous, threatening, pornographic, harassing, hateful, racially or ethnically offensive, or encourages conduct that would be considered a criminal offense, gives rise to civil liability, violate any law, or is otherwise inappropriate; (iv) post advertisements or solicitations of business; or (v) impersonate another person. YOUR BABY CAN READ! does not endorse any User Submission or any opinion, recommendation, or advice expressed therein, and YOUR BABY CAN READ! expressly disclaims any and all liability in connection with User Submissions. YOUR BABY CAN READ! does not permit copyright infringing activities and infringement of intellectual property rights on its Site, and YOUR BABY CAN READ! will remove all Content and User Submissions if properly notified that such Content or User Submission infringes on another's intellectual property rights. YOUR BABY CAN READ! reserves the right to remove Content and User Submissions without prior notice. YOUR BABY CAN READ! may also terminate a User's access to its Site if such User is determined to be a repeat infringer. A repeat infringer is a User who has been notified of infringing activity more than twice and/or has had a User Submission removed from the Site more than twice. YOUR BABY CAN READ! also reserves the right to decide whether Content or a User Submission is appropriate and complies with these Terms of Use for violations other than copyright infringement and violations of intellectual property law, such as, but not limited to, pornography, obscene or defamatory material, or excessive length. YOUR BABY CAN READ! may remove such User Submissions and/or terminate a User's access for uploading such material in violation of these Terms of Use at any time, without prior notice and at its sole discretion.

E. In particular, if you are a copyright owner or an agent thereof and believe that any User Submission or other content infringes upon your copyrights, you may submit a notification pursuant to the Digital Millennium Copyright Act ("DMCA") by providing our Copyright Agent with the following information in writing (see 17 U.S.C. 512(c)(3) for further detail):

(i) A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed;

(ii) Identification of the copyrighted work claimed to have been infringed; or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site;

(iii) Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled and information reasonably sufficient to permit the service provider to locate the material;

http://www.yourbabycanread.com/terms.html                          12/28/2010

(iv) Information reasonably sufficient to permit the service provider to contact you, such as an address, telephone number, and, if available, an electronic mail;

(v) A statement that you have a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law; and

(vi) A statement that the information in the notification is accurate, and under penalty of perjury, that you are authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

YOUR BABY CAN READ!'s designated Copyright Agent to receive notifications of claimed infringement is: YOUR BABY CAN READ! Copyright, Your Baby Can, LLC, 2320 Camino Vida Roble, suite 105, Carlsbad, CA 92011, or send an email to customerservice@yourbabycan.com with "YOUR BABY CAN READ! Copyright" in the subject line. For clarity, only DMCA notices should go to the Copyright Agent; any other feedback, comments, requests for technical support, and other communications should be directed to YOUR BABY CAN READ! customer service through http://www.yourbabycanread.com/contact_us.php. You acknowledge that, if you fail to comply with all of the requirements of this Section 4(D), your DMCA notice may not be valid.

F. You understand that, when using the YOUR BABY CAN READ! Site, you will be exposed to User Submissions from a variety of sources, and that YOUR BABY CAN READ! is not responsible for the accuracy, usefulness, safety, or intellectual property rights of, or relating to, such User Submissions. You further understand and acknowledge that you may be exposed to User Submissions that are inaccurate, offensive, indecent, or objectionable, and you agree to waive, and hereby do waive, any legal or equitable rights or remedies you have or may have against YOUR BABY CAN READ! with respect thereto, and agree to indemnify and hold YOUR BABY CAN READ!, its Owners/Operators, affiliates, and/or licensors, harmless to the fullest extent allowed by law regarding all matters related to your use of the site.

G. YOUR BABY CAN READ! permits you to link to materials on the Site for personal, non-commercial purposes only. In addition, YOUR BABY CAN READ! may choose to provide an "Embeddable Player" feature, which you may incorporate into your own personal, non-commercial website(s) for use in accessing the materials on the Site, provided that you include a prominent link back to the YOUR BABY CAN READ! website on the pages containing the Embeddable Player. YOUR BABY CAN READ! reserves the right to discontinue any aspect of the YOUR BABY CAN READ! Site at any time.

Choice of Law and Forum

These Terms are governed by California laws. Any action to enforce or

interpret them shall be brought and maintained exclusively in the Superior
Court of the State of California in Los Angeles. The parties irrevocably
submit to the jurisdiction of said court and waive all objections thereto and
waive the right to remove such action to a Federal District Court.
**Severability and Integration**

Unless otherwise specified herein, these Terms of Use and the Privacy Policy
constitute the entire agreement between you and Your Baby Can Read! and
its affiliates with respect to this site and the Service and supersedes all prior
or contemporaneous communications and proposals (whether oral, written, or
electronic) between you and Your Baby Can Read! with respect to the
Service. If any part of these Terms of Use or the Privacy Policy is held
invalid or unenforceable, that portion shall be construed in a manner
consistent with applicable law to reflect, as nearly as possible, the original
intentions of the parties, and the remaining portions shall remain in full force
and effect.

**Notice of Change**

Your Baby Can Read! may at any time revise these Terms of Use by updating
this posting. You are bound by any such revisions and should therefore
periodically visit this page to review the then current Terms of Use.

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
NOTICE OF CASE ASSIGNMENT - UNLIMITED CIVIL CASE

Case Number _____   **BC459187**

THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

Your case is assigned for all purposes to the judicial officer indicated below (Local Rule 7.3(c)). There is additional information on the reverse side of this form.

| ASSIGNED JUDGE | DEPT | ROOM | ASSIGNED JUDGE | DEPT | ROOM | |
|---|---|---|---|---|---|---|
| Hon. Elihu M. Berle | 1 | 534 | Hon. Holly E. Kendig | 42 | 416 | |
| Hon. J. Stephen Czuleger | 3 | 224 | Hon. Mel Red Recana | 45 | 529 | |
| Hon. Luis A. Lavin | 13 | 630 | Hon. Debre Katz Weintraub | 47 | 507 | |
| Hon. Terry A. Green | 14 | 300 | Hon. Elizabeth Allen White | 48 | 506 | |
| Hon. Richard Fruin | 15 | 307 | Hon. Conrad Aragon | 49 | 509 | |
| Hon. Rita Miller | 16 | 306 | Hon. John Shepard Wiley Jr. | 50 | 508 | |
| Hon. Richard E. Rico | 17 | 309 | Hon. Abraham Khan | 51 | 511 | |
| Hon. Rex Heeseman | 19 | 311 | Hon. Susan Bryant-Deason | 52 | 510 | |
| Hon. Kevin C. Brazile | 20 | 310 | Hon. John P. Shook | 53 | 513 | |
| Hon. Zaven V. Sinanian | 23 | 315 | Hon. Ernest M. Hiroshige | 54 | 512 | |
| Hon. Robert L. Hess | 24 | 314 | Hon. Malcolm H. Mackey | 55 | 515 | |
| Hon. Mary Ann Murphy | 25 | 317 | Hon. Michael Johnson | 56 | 514 | |
| Hon. James R. Dunn | 26 | 316 | Hon. Ralph W. Dau | 57 | 517 | |
| Hon. Yvette M. Palazuelos | 28 | 318 | Hon. Rolf M. Treu | 58 | 516 | |
| Hon. John A. Kronstadt | 30 | 400 | Hon. David L. Minning | 61 | 632 | |
| Hon. Alan S. Rosenfield | 31 | 407 | Hon. Michael L. Stern | 62 | 600 | |
| Hon. Mary H. Strobel | 32 | 406 | Hon. Kenneth R. Freeman | 64 | 601 | |
| Hon. Charles F. Palmer | 33 | 409 | Hon. Mark Mooney | 68 | 617 | |
| Hon. Amy D. Hogue | 34 | 408 | Hon. Ramona See | 69 | 621 | |
| Hon. Daniel Buckley | 35 | 411 | Hon. Soussan G. Bruguera | 71 | 729 | |
| Hon. Gregory Alarcon | 36 | 410 | Hon. Ruth Ann Kwan | 72 | 731 | |
| Hon. Joanne O'Donnell | 37 | 413 | Hon. Teresa Sanchez-Gordon | 74 | 735 | |
| Hon. Maureen Duffy-Lewis | 38 | 412 | Hon. William F. Fahey | 78 | 730 | |
| Hon. Michael C. Solner | 39 | 415 | Hon. Emilie H. Elias* | 324 | CCW | |
| Hon. Michelle R. Rosenblatt | 40 | 414 | Other | | | |
| Hon. Ronald M. Sohigian | 41 | 417 | | | | |

**\*Class Actions**
All class actions are initially assigned to Judge Emilie H. Elias in Department 324 of the Central Civil West Courthouse (600 S. Commonwealth Ave., Los Angeles 90005). This assignment is for the purpose of assessing whether or not the case is complex within the meaning of California Rules of Court, rule 3.400. Depending on the outcome of that assessment, the class action case may be reassigned to one of the judges of the Complex Litigation Program or reassigned randomly to a court in the Central District.

Given to the Plaintiff/Cross-Complainant/Attorney of Record on _____   JOHN A. CLARKE, Executive Officer/Clerk

By _____, Deputy Clerk

LACIV CCH 190 (Rev. 04/10)                           NOTICE OF CASE ASSIGNMENT –                           Page 1 of 2
LASC Approved 05-06                                    UNLIMITED CIVIL CASE

Exhibit _A_ Page _81_

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the Chapter Seven Rules, as applicable in the Central District, are summarized for your assistance.

### APPLICATION

The Chapter Seven Rules were effective January 1, 1994. They apply to all general civil cases.

### PRIORITY OVER OTHER RULES

The Chapter Seven Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE

A challenge under Code of Civil Procedure section 170.6 must be made within 15 days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS

Cases assigned to the Individual Calendaring Court will be subject to processing under the following time standards:

**COMPLAINTS:** All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days of filing.

**CROSS-COMPLAINTS:** Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

A Status Conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE

The Court will require the parties at a status conference not more than 10 days before the trial to have timely filed and served all motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested jury instructions, and special jury instructions and special jury verdicts. These matters may be heard and resolved at this conference. At least 5 days before this conference, counsel must also have exchanged lists of exhibits and witnesses and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Eight of the Los Angeles Superior Court Rules.

### SANCTIONS

The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Seven Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Seven Rules. Such sanctions may be on a party or if appropriate on counsel for the party.

**This is not a complete delineation of the Chapter Seven Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is absolutely imperative.**

Exhibit___A___Page___82___

*(handwritten: #4585-060  Ct Clrk)*

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Rachel L. Jensen (Bar No. 211456)<br>Robbins Geller Rudman & Dowd LLP<br>655 West Broadway, Suite 1900, San Diego, CA 92101<br>TELEPHONE NO.: 619/231-1058   FAX NO.: 619/231-7423<br>ATTORNEY FOR *(Name)*: F. Beth Gasner, on Behalf of Herself and All Others Similarly Situated | **CONFORMED COPY**<br>OF ORIGINAL FILED<br>Los Angeles Superior Court<br><br>DEC 29 2010<br><br>John A. Clarke, Executive Officer/Clerk<br>By _____ Deputy<br>DAWN ALEXANDER |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 North Hill St.
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, 90012
BRANCH NAME: Stanley Mosk Courthouse

CASE NAME: Gasner v. Your Baby Can, LLC et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | CASE NUMBER: **BC452137** |
|---|---|---|---|
| [X] Unlimited<br>(Amount demanded exceeds $25,000) | [ ] Limited<br>(Amount demanded is $25,000 or less) | [ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [X] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [X] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [X] is   [ ] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [X] Large number of separately represented parties   d. [ ] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve   e. [X] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. [X] Substantial amount of documentary evidence   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a. [X] monetary   b. [X] nonmonetary; declaratory or injunctive relief   c. [X] punitive
4. Number of causes of action *(specify)*: 6
5. This case [X] is   [ ] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: December 29, 2010

Rachel L. Jensen
*(TYPE OR PRINT NAME)*

*Rachel Jensen (with permission)*
*(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)*

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

*Page 1 of 2*

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

*(handwritten: Exhibit A  Page 83)*

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
    Damage/Wrongful Death
Uninsured Motorist (46) *(if the
    case involves an uninsured
    motorist claim subject to
    arbitration, check this item
    instead of Auto)*
**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/
        Wrongful Death
Product Liability *(not asbestos or
    toxic/environmental)* (24)
Medical Malpractice (45)
    Medical Malpractice–
        Physicians & Surgeons
    Other Professional Health Care
        Malpractice
Other PI/PD/WD (23)
    Premises Liability (e.g., slip
        and fall)
    Intentional Bodily Injury/PD/WD
        (e.g., assault, vandalism)
    Intentional Infliction of
        Emotional Distress
    Negligent Infliction of
        Emotional Distress
    Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
    Practice (07)
Civil Rights (e.g., discrimination,
    false arrest) *(not civil
    harassment)* (08)
Defamation (e.g., slander, libel)
    (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice
        *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
    Breach of Rental/Lease
        Contract *(not unlawful detainer
        or wrongful eviction)*
    Contract/Warranty Breach–Seller
        Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/
        Warranty
    Other Breach of Contract/Warranty
Collections (e.g., money owed, open
    book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections
        Case
Insurance Coverage *(not provisionally
    complex)* (18)
    Auto Subrogation
    Other Coverage
Other Contract (37)
    Contractual Fraud
    Other Contract Dispute
**Real Property**
Eminent Domain/Inverse
    Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent
    domain, landlord/tenant, or
    foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
    drugs, check this item; otherwise,
    report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court
        Case Matter
    Writ–Other Limited Court Case
        Review
Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor
        Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
    *(arising from provisionally complex
    case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
    Abstract of Judgment (Out of
        County)
    Confession of Judgment *(non-
        domestic relations)*
    Sister State Judgment
    Administrative Agency Award
        *(not unpaid taxes)*
    Petition/Certification of Entry of
        Judgment on Unpaid Taxes
    Other Enforcement of Judgment
        Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
    above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-
        harassment)*
    Mechanics Lien
    Other Commercial Complaint
        Case *(non-tort/non-complex)*
    Other Civil Complaint
        *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate
    Governance (21)
Other Petition *(not specified
    above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult
        Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late
        Claim
    Other Civil Petition

CM-010 [Rev. July 1, 2007]                     **CIVIL CASE COVER SHEET**

Exhibit ___A___ Page ___84___

CM-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Rachel L. Jensen (Bar No. 211456)<br>Robbins Geller Rudman & Dowd LLP<br>655 West Broadway, Suite 1900<br>San Diego, CA 92101<br>TELEPHONE NO: 619/231-1058    FAX NO. *(Optional):* 619/231-7423<br>E-MAIL ADDRESS *(Optional):* RachelJ@rgrdlaw.com<br>ATTORNEY FOR *(Name):* F. Beth Gasner, on Behalf of Herself and All Others Similarly Situated | **FILED**<br>Los Angeles Superior Court<br><br>DEC 29 2010<br><br>JOHN A. CLARKE, CLERK<br><br>BY DAWN ALEXANDER, DEPUTY |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 North Hill St.
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Stanley Mosk Courthouse

PLAINTIFF/PETITIONER: F. Beth Gasner, et al.

DEFENDANT/RESPONDENT: Your Baby Can, LLC et al.

| | CASE NUMBER: BC45098 7 |
|---|---|
| **NOTICE OF RELATED CASE** | JUDICIAL OFFICER:<br><br>DEPT.: |

BY FAX

*Identify, in chronological order according to date of filing, all cases related to the case referenced above.*

1. a. Title: Johnson et al. v. Your Baby Can, LLC et al.

   b. Case number: BC450907

   c. Court: [✓] same as above

   [ ] other state or federal court *(name and address):*

   d. Department: D324 Emilie Elias

   e. Case type: [ ] limited civil [✓] unlimited civil [ ] probate [ ] family law [ ] other *(specify):*

   f. Filing date: 12/08/2010

   g. Has this case been designated or determined as "complex?" [✓] Yes [ ] No

   h. Relationship of this case to the case referenced above *(check all that apply):*

   [✓] involves the same parties and is based on the same or similar claims.

   [✓] arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

   [ ] involves claims against, title to, possession of, or damages to the same property.

   [✓] is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

   [ ] Additional explanation is attached in attachment 1h

   i. Status of case:

   [✓] pending

   [ ] dismissed [ ] with [ ] without prejudice

   [ ] disposed of by judgment

2. a. Title:

   b. Case number:

   c. Court: [ ] same as above

   [ ] other state or federal court *(name and address):*

   d. Department:

| Form Approved for Optional Use<br>Judicial Council of California<br>CM-015 [Rev. July 1, 2007] | **NOTICE OF RELATED CASE** | Cal. Rules of Court, rule 3.300<br>www.courtinfo.ca.gov |
|---|---|---|

Exhibit A Page 85

CM-015

| PLAINTIFF/PETITIONER:  F. Beth Gasner, et al. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Your Baby Can, LLC et al. | |

2. *(continued)*

  e. Case type: ☐ limited civil   ☐ unlimited civil   ☐ probate   ☐ family law   ☐ other *(specify):*

  f. Filing date:

  g. Has this case been designated or determined as "complex?"   ☐ Yes   ☐ No

  h. Relationship of this case to the case referenced above *(check all that apply):*

  ☐ involves the same parties and is based on the same or similar claims.

  ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact. ·

  ☐ involves claims against, title to, possession of, or damages to the same property.

  ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

  ☐ Additional explanation is attached in attachment 2h

  i. Status of case:

  ☐ pending

  ☐ dismissed ☐ with ☐ without prejudice

  ☐ disposed of by judgment

3.  a. Title:

   b. Case number:

   c. Court: ☐ same as above

   ☐ other state or federal court *(name and address):*

   d. Department:

   e. Case type: ☐ limited civil   ☐ unlimited civil   ☐ probate   ☐ family law   ☐ other *(specify):*

   f. Filing date:

   g. Has this case been designated or determined as "complex?"   ☐ Yes   ☐ No

   h. Relationship of this case to the case referenced above *(check all that apply):*

   ☐ involves the same parties and is based on the same or similar claims.

   ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

   ☐ involves claims against, title to, possession of, or damages to the same property.

   ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

   ☐ Additional explanation is attached in attachment 3h

   i. Status of case:

   ☐ pending

   ☐ dismissed ☐ with ☐ without prejudice

   ☐ disposed of by judgment

4.  ☐ Additional related cases are described in Attachment 4. Number of pages attached: _____

Date: December 29, 2010

Rachel L. Jensen
(TYPE OR PRINT NAME OF PARTY OR ATTORNEY)

▶ *Rachel Jensen /with permission*
(SIGNATURE OF PARTY OR ATTORNEY)

CM-015 [Rev July 1, 2007]                    **NOTICE OF RELATED CASE**                    Page 2 of 3

Exhibit ___A___ Page ___86___

CM-015

| PLAINTIFF/PETITIONER: F. Beth Gasner, et al. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Your Baby Can, LLC et al. | |

## PROOF OF SERVICE BY FIRST-CLASS MAIL
### NOTICE OF RELATED CASE

*(NOTE: You cannot serve the Notice of Related Case if you are a party in the action. The person who served the notice must complete this proof of service. The notice must be served on all known parties in each related action or proceeding.)*

1. I am at least 18 years old and not a party to this action. I am a resident of or employed in the county where the mailing took place, and my residence or business address is *(specify):*

2. I served a copy of the *Notice of Related Case* by enclosing it in a sealed envelope with first-class postage fully prepaid and *(check one):*
   a. ☐ deposited the sealed envelope with the United States Postal Service.
   b. ☐ placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

3. The *Notice of Related Case* was mailed:
   a. on *(date):*
   b. from *(city and state):*

4. The envelope was addressed and mailed as follows:
   a. Name of person served:

      Street address:
      City:
      State and zip code:

   b. Name of person served:

      Street address:
      City:
      State and zip code:

   c. Name of person served:

      Street address:
      City:
      State and zip code:

   d. Name of person served:

      Street address:
      City:
      State and zip code:

☐ Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

_____          ▶          _____
(TYPE OR PRINT NAME OF DECLARANT)                         (SIGNATURE OF DECLARANT)

Exhibit _A_ Page _87_

**FILED**

LOS ANGELES SUPERIOR COURT

NOTICE SENT TO:

Rudman, Samuel L.
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville                NY   11747

JAN 27 2011

JOHN A. CLARKE, CLERK

BY BRENT

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | | CASE NUMBER |
|---|---|---|
| F BETH GASNER | Plaintiff(s), | BC452137 |
| VS. | | |
| YOUR BABY CAN LLC ET AL | Defendant(s). | **NOTICE OF CASE MANAGEMENT CONFERENCE** |

TO THE PLAINTIFF(S)/ATTORNEY(S) FOR PLAINTIFF(S) OF RECORD:

You are ordered to serve this notice of hearing on all parties/attorneys of record forthwith, and meet and confer with all parties/attorneys of record about the matters to be discussed no later than 30 days before the Case Management Conference.

Your Case Management Conference has been scheduled for April 28, 2011 at 8:30 am in Dept. 17 at 111 North Hill Street, Los Angeles, California 90012.

**NOTICE TO DEFENDANT:**  **THE SETTING OF THE CASE MANAGEMENT CONFERENCE DOES NOT EXEMPT THE DEFENDANT FROM FILING A RESPONSIVE PLEADING AS REQUIRED BY LAW.**

Pursuant to California Rules of Court, rules 3.720-3.730, a completed Case Management Statement (Judicial Council form # CM-110) must be filed at least **15 calendar days** prior to the Case Management Conference. The Case Management Statement may be filed jointly by all parties/attorneys of record or individually by each party/attorney of record. You must be familiar with the case and be fully prepared to participate effectively in the Case Management Conference.

At the Case Management Conference, the Court may make pretrial orders including the following, but not limited to, an order establishing a discovery schedule; an order referring the case to Alternative Dispute Resolution (ADR); an order reclassifying the case; an order setting subsequent conference and the trial date; or other orders to achieve the goals of the Trial Court Delay Reduction Act (Gov. Code, section 68600 et seq.)

Notice is hereby given that if you do not file the Case Management Statement or appear and effectively participate at the Case Management Conference, the Court may impose sanctions pursuant to LASC Local Rule 7.13, Code of Civil Procedure sections 177.5, 575.2, 583.150, 583.360 and 583.410, Government Code Section 68608 (b), and California Rules of Court 2.2 et seq.

Date: January 27, 2011

RICHARD E. RICO
Judicial Officer

### CERTIFICATE OF SERVICE

I, the below named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Notice of Case Management Conference upon each party or counsel named above:

[ ✓ ] by depositing in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed herein in a separate sealed envelope to each address as shown above with postage thereon fully prepaid.

[  ] by personally giving the party notice upon filing the complaint.

Date: January 27, 2011

John A. Clarke, Executive Officer/Clerk

by _____, Deputy Clerk

LACIV 132 (Rev. 09/07)
LASC Approved 10-03

Cal. Rules of Court, rule 3.720-3.730
LASC Local Rules, Chapter Seven

Exhibit _A_ Page _88_

NOTICE SENT TO:

Rudman, Samuel L.
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville                NY  11747

FILED
LOS ANGELES SUPERIOR COURT

JAN 27 2011

JOHN A. CLARKE, CLERK

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

|  |  | CASE NUMBER |
|---|---|---|
| F BETH GASNER | Plaintiff(s), | BC452137 |
| VS. | | |
| YOUR BABY CAN LLC ET AL | Defendant(s). | **ORDER TO SHOW CAUSE HEARING** |

To the party/attorney of record:

You are ordered to appear for an Order to Show Cause Hearing on February 28, 2011 at 8:30 am in Dept. 17 of this court, Central District, 111 North Hill Street, Los Angeles, California 90012, and show cause why sanctions should not be imposed for:

**Failure to file Proof of Service of [✓] Petition [ ] Summons and [✓] Complaint [✓] Cross-Complaint pursuant to California Rules of Court, rule 3.110(b) and (c) as to: ALL DEFENDANTS**

Failure to comply or appear may result in sanctions, pursuant to one or more of the following: California Rules of Court, rule 2.30, and rule 3.1340; Code of Civil Procedure sections 177.5, 575.2, 583.150, 583.310, 583.360, 583.410, 583.420, 583.430; and Government Code section 68608.

[✓] To avoid a mandatory appearance all required documents must be filed in [ ] this Dept [✓] Clerk's Office, Room 102 at least 5 court days prior to the date of the hearing.

[ ] The Court may infer from your failure to appear that possession of the premises is no longer at issue, and that your case is not entitled to preference in setting pursuant to Code of Civil Procedure section 1179a.

[ ] You are ordered to give notice of said hearing forthwith to any party served with summons and complaint prior to OSC Hearing and file a Proof of Service in this department or Clerk's Office at least 5 court days prior to the date of the hearing.

Dated: January 27, 2011

Judicial Officer
RICHARD E. RICO

## CERTIFICATE OF MAILING

I, the below named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Order to Show Cause Hearing upon each party or counsel named above by depositing in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown above with the postage thereon fully prepaid.

Date: January 27, 2011

John A. Clarke, EXECUTIVE OFFICER/CLERK

By _____, Deputy Clerk

ORDER TO SHOW CAUSE HEARING

LACIV 166-1 (Rev. 09/08)
LASC Approved 06-04

LASC Local Rules, Chapter 7
Cal. Rules of Court, rule 2.30

Exhibit A Page 89

CATES PETERSON LLP
MARK D. PETERSON (Bar No. CA 126174)
E-Mail: markpeterson@catespeterson.com
4100 Newport Place, Suite 230
Newport Beach, California 92660
Phone: (949) 724-1180
Facsimile: (949) 724-1190

*Attorneys for Defendant*
Robert Titzer, Ph.D.

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

FEB 14 2011

John A. Clarke, Executive Officer/Clerk
By _____, Deputy
A. El LaFLEUR-CLAYTON

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| F. BETH GASNER, on behalf of herself and All Persons Similarly Situated,<br><br>Plaintiffs,<br><br>vs.<br><br>YOUR BABY CAN LLC; ROBERT TITZER, Ph.D.,<br><br>Defendants. | Case No.  BC452137<br><br>DEFENDANT ROBERT TITZER, PH.D.'S ANSWER TO PLAINTIFF'S UNVERIFIED COMPLAINT<br><br>Date Filed:  December 29, 2010<br><br>Trial Date:  None Set |

Defendant Robert Titzer, Ph.D., answering the plaintiff's unverified complaint for himself alone, responds as follows:

**GENERAL DENIAL**

1. Pursuant to Section 431.30(d) of the California Code of Civil Procedure, Dr. Titzer generally denies each and every allegation in the complaint and denies that plaintiff is entitled to the relief sought, or that plaintiff has been damaged in any manner.

**AFFIRMATIVE DEFENSES**

2. As separate and distinct affirmative defenses to the complaint, Dr. Titzer alleges as follows:

---

DEFENDANT ROBERT TITZER, PH.D.'S ANSWER TO COMPLAINT

### FIRST AFFIRMATIVE DEFENSE

(Failure to State Facts Sufficient to Constitute Cause of Action)

3. The complaint, and each of the causes of action, fails to state facts sufficient to constitute a cause of action against Dr. Titzer.

### SECOND AFFIRMATIVE DEFENSE

(Lack of Standing)

4. On information and belief, plaintiff lacks standing to sue under the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq* ("UCL") because she has not suffered an injury in fact and a loss of money or property.

### THIRD AFFIRMATIVE DEFENSE

(Freedom of Speech)

5. Because they constitute truthful and non-misleading speech, the advertisements challenged in the complaint are entitled to protection under the First Amendment of the United States Constitution, as well as the right to free speech protected under the California Constitution.

### FOURTH AFFIRMATIVE DEFENSE

(Laches)

6. Plaintiff's action is barred by the equitable doctrine of laches.

### FIFTH AFFIRMATIVE DEFENSE

(Statutes of Limitations)

7. Each cause of action in the complaint is barred by the relevant statute of limitations, including but not limited to Code of Civil Procedure Sections 337(1), 338(a), (d), and (h) and 343, Cal. Bus. & Prof. Code § 17208, and any applicable contractual limitations period.

### SIXTH AFFIRMATIVE DEFENSE

(Unclean Hands)

8. Each cause of action in the complaint is barred by the doctrine of unclean hands.

DEFENDANT YOUR BABY CAN READ LLC'S ANSWER TO COMPLAINT

Exhibit____*A*____Page____*91*

## SEVENTH AFFIRMATIVE DEFENSE

(Estoppel)

9. Plaintiff is estopped from claiming or recovering the damages and/or other relief sought in the complaint.

## EIGHTH AFFIRMATIVE DEFENSE

(Waiver)

10. Plaintiff, by her acts and/or omissions, has waived any right to recover for the causes of action alleged in the complaint.

## NINTH AFFIRMATIVE DEFENSE

(Consent)

11. Plaintiff consented to the acts alleged in the complaint by voluntarily signing up for the services provided by Your Baby Can, LLC.

## TENTH AFFIRMATIVE DEFENSE

(Plaintiff Lacks Standing to Seek Injunctive Relief Under UCL)

12. Plaintiff lacks standing to seek injunctive relief under the UCL because she has no ongoing contractual or other relationship with Your Baby Can, LLC or Dr. Titzer and, therefore, is not personally threatened by the misconduct alleged.

## ELEVENTH AFFIRMATIVE DEFENSE

(Insubstantial Consumer Harm Precludes "Unfairness")

13. The harm to consumers, if any, from Your Baby Can, LLC's or Dr. Titzer's alleged business practices is insubstantial. The absence of substantial injury to consumers precludes a finding of "unfairness" and, accordingly, plaintiff' UCL claims are without merit.

## TWELFTH AFFIRMATIVE DEFENSE

(The Challenged Practices' Utility Precludes "Unfairness" under UCL)

14. The harm, if any, attributable to Your Baby Can LLC's or Dr. Titzer's alleged business practices is outweighed by the utility of those practices. The presence of such countervailing utility precludes a finding of "unfairness" and, accordingly, the UCL claims for relief are without merit.

3

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Countervailing Benefits to Consumers Preclude Unfairness under UCL)

15. The harm, if any, attributable to Your Baby Can LLC's or Dr. Titzer's alleged business practices is outweighed by countervailing benefits to consumers. The presence of such countervailing consumer benefits precludes a finding of "unfairness" and, accordingly, the UCL claims for relief are without merit.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Conduct Not Unlawful)

16. The complaint and alleged causes of action, and each of them, are barred because Your Baby Can, LLC's and Dr. Titzer's practices as alleged are not "unlawful" within the meaning of Cal. Bus. & Prof. Code §§ 17200 or 17500.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Conduct Not Fraudulent or Deceptive)

17. The complaint and alleged causes of action, and each of them, are barred because the alleged practices are not "fraudulent" or "deceptive" within the meaning of Cal. Bus. & Prof. Code § 17200.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Plaintiff's Claims Not Typical)

18. On information and belief, this case is not suitable for class certification because, among other reasons, plaintiff's claims are not typical of the putative class she purports to represent.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Plaintiff Does Not Adequately Represent the Putative Class)

19. On information and belief, plaintiff is not an adequate class representatives of the putative class.

4

DEFENDANT YOUR BABY CAN READ LLC'S ANSWER TO COMPLAINT

## EIGHTEENTH AFFIRMATIVE DEFENSE

### (Common Issues Do Not Predominate)

20. On information and belief, class treatment is not proper because common issues of law and facts do not predominate over individual issues.

## NINETEENTH AFFIRMATIVE DEFENSE

### (Lack of Damages)

21. Plaintiff's damages, if any, are *de minimis*. Therefore, plaintiff cannot establish that class treatment would substantially benefit both the litigants and the court.

## TWENTIETH AFFIRMATIVE DEFENSE

### (No Basis for Attorneys' Fees)

22. The complaint fails to state facts that would entitle plaintiff to recover attorneys' fees.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

23. Dr. Titzer is informed and believes, and on that basis alleges, that at all times relevant, plaintiff has failed, neglected and refused to mitigate damages, if any, thus barring, or at least reducing, any recovery to which plaintiff might be entitled in this lawsuit.

WHEREFORE, Dr. Titzer prays as follows:

1. That plaintiff take nothing by way of the complaint and that the complaint be dismissed;

2. That judgment be entered against plaintiff and in favor of Dr. Titzer;

3. That Dr. Titzer be awarded his costs of suit; and

4. For such other and further relief as this Court deems just and proper.

Dated: February 10, 2011                    CATES PETERSON LLP

By: _Mark Peterson_

Mark D. Peterson
*Attorneys for Defendant*
ROBERT TITZER, PH.D.

5

**PROOF OF SERVICE**

*F. Beth Gasner etc. et al. v. Your Baby Can LLC; Robert Titzer, Ph.D.*
**Los Angeles County Superior Court Case No. BC 452137**

I, Paulette E. Surjue, declare as follows:

I am employed in Los Angeles County, Los Angeles, California. I am over the age of eighteen years and not a party to this action. My business address is MANATT, PHELPS & PHILLIPS, LLP, 11355 West Olympic Boulevard, Los Angeles, California 90064-1614. On February 14, 2011, I served the within:

**DEFENDANT ROBERT TITZER, PH.D.'S ANSWER TO PLAINTIFF'S UNVERIFIED COMPLAINT**

on the interested parties in this action addressed as follows:

| | |
|---|---|
| Rachel L. Jensen, Esq. | Samuel H. Rudman, Esq. |
| Robbins Geller Rudman Dowd LLP | Robert M. Rothman, Esq. |
| 655 West Broadway, Suite 1900 | Mark S. Reich, Esq. |
| San Diego, CA 92101 | Edward Y. Kroub, Esq. |
| Telephone: (619) 231-1058 | Robins Geller Rudman & Dowd LLP |
| Facsimile: (619) 231-7423 | 58 South Service Road, Suite 200 |
| | Melville, NY 11747 |
| | Telephone: (631) 367-7100 |
| | Facsimile: (631) 367-1173 |

[X] **(BY MAIL)** By placing such document(s) in a sealed envelope, with postage thereon fully prepaid for first class mail, for collection and mailing at Manatt, Phelps & Phillips, LLP, Los Angeles, California following ordinary business practice. I am readily familiar with the practice at Manatt, Phelps & Phillips, LLP for collection and processing of correspondence for mailing with the United States Postal Service, said practice being that in the ordinary course of business, correspondence is deposited in the United States Postal Service the same day as it is placed for collection.

[ ] **(BY OVERNIGHT MAIL)** By placing such document(s) in a sealed envelope, for collection and overnight mailing at Manatt, Phelps & Phillips, LLP, Los Angeles, California following ordinary business practice. I am readily familiar with the practice at Manatt, Phelps & Phillips, LLP for collection and processing of overnight service mailing, said practice being that in the ordinary course of business, correspondence is deposited with the overnight messenger service, _____, for delivery as addressed.

[ ] **(BY PERSONAL SERVICE)** By causing such document(s) to be delivered by hand, as addressed by delivering same to_____ with instructions that it be personally served.

300214425.1

PROOF OF SERVICE

Exhibit __A__ Page __95__

1

☐ **(BY FACSIMILE)** By transmitting (or causing to be transmitted) such document(s) by use of facsimile machine telephone number (310) 312-4224 at _____ [time] to the parties at the facsimile numbers listed on the service list above. The facsimile machine used complies with California Rules of Court, Rule 2003(3). The transmission was reported as complete and no error was reported by the machine. I caused the transmitting machine to print a record of the transmission, a copy of which is attached to this declaration.

2

3

4

5

☐ **(BY ELECTRONIC MAIL)** By transmitting such document(s) electronically at [time] from my e-mail address, psurjue@manatt.com at Manatt, Phelps & Phillips, LLP, Los Angeles, California, to the person(s) at the electronic mail addresses listed above.  The transmission was reported as complete and without error.

6

7

8

☐ **(BY PUC E-MAIL SERVICE)** By transmitting such document(s) electronically from Manatt, Phelps & Phillips, LLP, Los Angeles, California, to the electronic mail addresses listed above. I am readily familiar with the practices of Manatt, Phelps & Phillips, LLP for transmitting documents by electronic mail, said practice being that in the ordinary course of business, such electronic mail is transmitted immediately after such document has been tendered for filing. Said practice also complies with Rule 2.3(b) of the Public Utilities Commission of the State of California and all protocols described therein.

9

10

11

12

13

14

    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on February 14, 2011, at Los Angeles, California.

15

16

17

_____

PAULETTE E. SURJUE

18

19

20

21

22

23

24

25

26

27

28

300214425.1

2

COPY

1  MANATT, PHELPS & PHILLIPS, LLP
   BRAD W. SEILING (Bar No. CA 143515)
2  CHAD S. HUMMEL (Bar No. CA 139055)
   ERIN C. WITKOW (Bar No. CA 216994)
3  11355 West Olympic Boulevard
   Los Angeles, CA  90064-1614
4  Telephone:  (310) 312-4000
   Facsimile:  (310) 312-4224
5
6  Attorneys for Defendant
   Your Baby Can LLC
7
8              SUPERIOR COURT OF THE STATE OF CALIFORNIA
9                  FOR THE COUNTY OF LOS ANGELES
10
11 F. BETH GASNER, on behalf of herself          Case No.  BC452137
   and All Persons Similarly Situated,
12                                               **DEFENDANT YOUR BABY CAN LLC'S**
                 Plaintiffs,                     **ANSWER TO PLAINTIFF'S COMPLAINT**
13
        vs.
14                                               CLASS ACTION COMPLAINT
   YOUR BABY CAN LLC; ROBERT
15 TITZER, Ph.D.,                                JURY TRIAL DEMANDED
16               Defendants.                     Complaint Filed:  December 29, 2010
                                                 Trial Date:  None Set
17
18
19
20      Defendant Your Baby Can LLC ("YBC") answers the complaint of plaintiff F. Beth

21 Gasner ("Plaintiff") as follows:

22                            **GENERAL DENIAL**

23      Pursuant to Section 431.30(d) of the California Code of Civil Procedure,

24 Defendant generally denies each and every allegation in the Complaint and denies that Plaintiff is

25 entitled to the relief sought, or that Plaintiff has been damaged in any manner.

26                         **AFFIRMATIVE DEFENSES**

27      As separate and distinct affirmative defenses to the Complaint, Defendant alleges

28 as follows:

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

FEB 14 2011

John A. Clarke, Executive Officer/Clerk
By _____, Deputy
A.E. LaFLEUR-CLAYTON

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT YOUR BABY CAN READ LLC'S ANSWER TO COMPLAINT

## FIRST AFFIRMATIVE DEFENSE

### (Failure to State Facts Sufficient to Constitute Cause of Action)

The Complaint, and each of the causes of action, fails to state facts sufficient to constitute a cause of action against Defendant.

## SECOND AFFIRMATIVE DEFENSE

### (Lack of Standing)

On information an belief, Plaintiff lacks standing to sue under the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq* ("UCL") because she has not suffered an injury in fact and a loss of money or property.

## THIRD AFFIRMATIVE DEFENSE

### (*Freedom of Speech*)

Because they constitute truthful and non-misleading speech, the advertisements challenged in the Complaint are entitled to protection under the First Amendment of the United States Constitution, as well as the right to free speech protected under the California Constitution.

## FOURTH AFFIRMATIVE DEFENSE

### (Laches)

Plaintiff's action is barred by the equitable doctrine of laches.

## FIFTH AFFIRMATIVE DEFENSE

### (Statutes of Limitations)

Each cause of action in the Complaint is barred by the relevant statute of limitations, including but not limited to Code of Civil Procedure Sections 337(1), 338(a), (d), and (h), and 343, Cal. Bus. & Prof. Code § 17208, and any applicable contractual limitations period.

## SIXTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

Each cause of action in the Complaint is barred by the doctrine of unclean hands.

1

## SEVENTH AFFIRMATIVE DEFENSE

2

(Estoppel)

3     Plaintiff is estopped from claiming or recovering the damages and/or other relief sought in

4     the Complaint.

5

## EIGHTH AFFIRMATIVE DEFENSE

6

(Waiver)

7     Plaintiff, by her acts and/or omissions, has waived any right to recover for the causes of

8     action alleged in the Complaint.

9

## NINTH AFFIRMATIVE DEFENSE

10

(Consent)

11     Plaintiff consented to the acts alleged in the Complaint by voluntarily signing up for the

12     services provided by Defendant.

13

## TENTH AFFIRMATIVE DEFENSE

14

(Plaintiff Lacks Standing to Seek Injunctive Relief Under UCL)

15     Plaintiff lacks standing to seek injunctive relief under the UCL because she has no

16     ongoing contractual or other relationship with Defendant and, therefore, is not personally

17     threatened by the misconduct alleged.

18

## ELEVENTH AFFIRMATIVE DEFENSE

19

(Insubstantial Consumer Harm Precludes "Unfairness")

20     The harm to consumers, if any, from Defendant's alleged business practices is

21     insubstantial. The absence of substantial injury to consumers precludes a finding of "unfairness"

22     and, accordingly, Plaintiff's UCL claim is without merit.

23

## TWELFTH AFFIRMATIVE DEFENSE

24

(The Challenged Practices' Utility Precludes "Unfairness" under UCL)

25     The harm, if any, attributable to Defendant's alleged business practices is outweighed by

26     the utility of those practices. The presence of such countervailing utility precludes a finding of

27     "unfairness" and, accordingly, the UCL claim is without merit.

28

3

DEFENDANT YOUR BABY CAN READ LLC'S ANSWER TO COMPLAINT

1

## THIRTEENTH AFFIRMATIVE DEFENSE

2

(Countervailing Benefits to Consumers Preclude Unfairness under UCL)

3   The harm, if any, attributable to Defendant's alleged business practices is outweighed by

4   countervailing benefits to consumers.  The presence of such countervailing consumer benefits

5   precludes a finding of "unfairness" and, accordingly, the UCL claim is without merit.

6

## FOURTEENTH AFFIRMATIVE DEFENSE

7

(Conduct Not Unlawful)

8   The Complaint and alleged causes of action, and each of them, are barred because

9   Defendant's practices as alleged are not "unlawful" under the UCL.

10

## FIFTEENTH AFFIRMATIVE DEFENSE

11

(Conduct Not Fraudulent or Deceptive)

12   The Complaint and alleged causes of action, and each of them, are barred because

13   Defendant's practices as alleged are not "fraudulent" or "deceptive" under the UCL.

14

## SIXTEENTH AFFIRMATIVE DEFENSE

15

(Plaintiff's Claims Not Typical)

16   On information and belief, this case is not suitable for class certification because, among

17   other reasons, Plaintiff's claims are not typical of the putative class she purports to represent.

18

## SEVENTEENTH AFFIRMATIVE DEFENSE

19

(Plaintiff Does Not Adequately Represent the Putative Class)

20   On information and belief, Plaintiff is not an adequate class representatives.

21

## EIGHTEENTH AFFIRMATIVE DEFENSE

22

(Common Issues Do Not Predominate)

23   On information and belief, class treatment is not proper because common issues of law

24   and fact do not predominate over individual issues.

25

## NINETEENTH AFFIRMATIVE DEFENSE

26

(No Basis for Attorneys' Fees)

27   The Complaint fails to state facts that would entitle Plaintiff to recover attorneys' fees.

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

4

DEFENDANT YOUR BABY CAN READ LLC'S ANSWER TO COMPLAINT

Exhibit __A__ Page __100__

## TWENTIETH AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

Defendant is informed and believes, and on that basis alleges, that at all times relevant, Plaintiff has failed, neglected and refused to mitigate damages, if any, thus barring, or at least reducing, any recovery to which Plaintiff might be entitled in this lawsuit.

WHEREFORE, Defendant prays as follows:

1. That Plaintiff take nothing by way of the complaint and that the complaint be dismissed;

2. That judgment be entered against Plaintiff and in favor of Defendant;

3. That Defendant be awarded its costs of suit herein; and

4. For such other and further relief as this Court deems just and proper.

Dated:   February 14, 2011         MANATT, PHELPS & PHILLIPS, LLP
                                   Brad W. Seiling
                                   Chad S. Hummel
                                   Erin C. Witkow


                                   By: _Brad Seiling_
                                       Brad W. Seiling
                                       *Attorneys for Defendant*
                                       YOUR BABY CAN LLC

300194533.1

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT YOUR BABY CAN READ LLC'S ANSWER TO COMPLAINT

Exhibit __A__ Page _101_

## PROOF OF SERVICE

*F. Beth Gasner etc. et al. v. Your Baby Can LLC; Robert Titzer, Ph.D.*
**Los Angeles County Superior Court Case No. BC 452137**

I, Paulette E. Surjue, declare as follows:

I am employed in Los Angeles County, Los Angeles, California. I am over the age of eighteen years and not a party to this action. My business address is MANATT, PHELPS & PHILLIPS, LLP, 11355 West Olympic Boulevard, Los Angeles, California 90064-1614. On February 14, 2011, I served the within:

**DEFENDANT YOUR BABY CAN LLC'S ANSWER TO PLAINTIFF'S COMPLAINT**

on the interested parties in this action addressed as follows:

Rachel L. Jensen, Esq.
Robbins Geller Rudman Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423

Samuel H. Rudman, Esq.
Robert M. Rothman, Esq.
Mark S. Reich, Esq.
Edward Y. Kroub, Esq.
Robins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: (631) 367-7100
Facsimile: (631) 367-1173

[X] **(BY MAIL)** By placing such document(s) in a sealed envelope, with postage thereon fully prepaid for first class mail, for collection and mailing at Manatt, Phelps & Phillips, LLP, Los Angeles, California following ordinary business practice. I am readily familiar with the practice at Manatt, Phelps & Phillips, LLP for collection and processing of correspondence for mailing with the United States Postal Service, said practice being that in the ordinary course of business, correspondence is deposited in the United States Postal Service the same day as it is placed for collection.

[ ] **(BY OVERNIGHT MAIL)** By placing such document(s) in a sealed envelope, for collection and overnight mailing at Manatt, Phelps & Phillips, LLP, Los Angeles, California following ordinary business practice. I am readily familiar with the practice at Manatt, Phelps & Phillips, LLP for collection and processing of overnight service mailing, said practice being that in the ordinary course of business, correspondence is deposited with the overnight messenger service, _____, for delivery as addressed.

[ ] **(BY PERSONAL SERVICE)** By causing such document(s) to be delivered by hand, as addressed by delivering same to_____ with instructions that it be personally served.

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

300214412.1

PROOF OF SERVICE

Exhibit *A* Page *102*

☐ **(BY FACSIMILE)** By transmitting (or causing to be transmitted) such document(s) by use of facsimile machine telephone number (310) 312-4224 at _____ [time] to the parties at the facsimile numbers listed on the service list above. The facsimile machine used complies with California Rules of Court, Rule 2003(3). The transmission was reported as complete and no error was reported by the machine. I caused the transmitting machine to print a record of the transmission, a copy of which is attached to this declaration.

☐ **(BY ELECTRONIC MAIL)** By transmitting such document(s) electronically at [time] from my e-mail address, psurjue@manatt.com at Manatt, Phelps & Phillips, LLP, Los Angeles, California, to the person(s) at the electronic mail addresses listed above.  The transmission was reported as complete and without error.

☐ **(BY PUC E-MAIL SERVICE)** By transmitting such document(s) electronically from Manatt, Phelps & Phillips, LLP, Los Angeles, California, to the electronic mail addresses listed above. I am readily familiar with the practices of Manatt, Phelps & Phillips, LLP for transmitting documents by electronic mail, said practice being that in the ordinary course of business, such electronic mail is transmitted immediately after such document has been tendered for filing. Said practice also complies with Rule 2.3(b) of the Public Utilities Commission of the State of California and all protocols described therein.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on February 14, 2011, at Los Angeles, California.

_____
PAULETTE E. SURJUE

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

300214412.1

2

PROOF OF SERVICE

Exhibit _A_ Page _103_

# EXHIBIT B

MANATT, PHELPS & PHILLIPS, LLP
Brad W Seiling (Bar No. CA 143515)
Chad S. Hummel (Bar No. CA 139055)
Erin C. Witkow (Bar No. CA 216994)
11355 West Olympic Boulevard
Los Angeles, CA  90064-1614
Telephone:  (310) 312-4000
Facsimile:  (310) 312-4224

*Attorneys for Defendant*
YOUR BABY CAN, LLC

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| F. BETH GASNER, on behalf of Herself and All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    vs.<br><br>YOUR BABY CAN, LLC, ROBERT TITZER, Ph.D., and DOES 1-100,<br><br>    Defendants. | Case No.  BC452137<br><br>**NOTICE TO THE CLERK OF THE LOS ANGELES COUNTY SUPERIOR COURT AND TO ADVERSE PARTIES OF REMOVAL OF ACTION TO FEDERAL DISTRICT COURT** |

TO THE CLERK OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF LOS ANGELES AND TO ALL ADVERSE PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on February 16, 2011, Defendant Your Baby Can, LLC caused to be filed a Notice of Removal of Civil Action to United States District Court for the Central District of California ("Notice of Removal"). Pursuant to 28 U.S.C. Section 1446(d), the filing of a copy of the Notice of Removal with the Clerk of this Court effects the removal of this action. This Court may not proceed further unless and until the action is remanded.

Attached as **Exhibit 1** is a true and correct copy of the Notice of Removal of Civil Action to the United States District Court and all documents filed concurrently with and in support of the Notice of Removal.

1 | Dated:    February 16, 2011        MANATT, PHELPS & PHILLIPS, LLP
2 |                                    BRAD W. SEILING
                                       CHAD S. HUMMEL
3 |                                    ERIN C. WITKOW
4 |
5 |                                    By: _____
                                           Erin C. Witkow
6 |                                        *Attorneys for Defendant*
                                           YOUR BABY CAN, LLC
7 |
8 |   300213161.1
9 |
10 |
11 |
12 |
13 |
14 |
15 |
16 |
17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |

## PROOF OF SERVICE

*F. Beth Gasner etc. et al. v. Your Baby Can LLC; Robert Titzer, Ph.D.*

I, Terrie Auzenne, declare as follows:

I am employed in Los Angeles County, Los Angeles, California. I am over the age of eighteen years and not a party to this action. My business address is MANATT, PHELPS & PHILLIPS, LLP, 11355 West Olympic Boulevard, Los Angeles, California 90064-1614. On February 16, 2011, I served the within:

**NOTICE OF REMOVAL OF CIVIL ACTION TO UNITED STATES DISTRICT COURT UNDER 28 U.S.C. §§ 1441 AND 1446**

on the interested parties in this action addressed as follows:

| | |
|---|---|
| Rachel L. Jensen, Esq.<br>Robbins Geller Rudman Dowd LLP<br>655 West Broadway, Suite 1900<br>San Diego, CA 92101<br>Telephone: (619) 231-1058<br>Facsimile: (619) 231-7423 | Samuel H. Rudman, Esq.<br>Robert M. Rothman, Esq.<br>Mark S. Reich, Esq.<br>Edward Y. Kroub, Esq.<br>Robins Geller Rudman & Dowd LLP<br>58 South Service Road, Suite 200<br>Melville, NY 11747<br>Telephone: (631) 367-7100<br>Facsimile: (631) 367-1173 |

☒   **(BY MAIL)** By placing such document(s) in a sealed envelope, with postage thereon fully prepaid for first class mail, for collection and mailing at Manatt, Phelps & Phillips, LLP, Los Angeles, California following ordinary business practice. I am readily familiar with the practice at Manatt, Phelps & Phillips, LLP for collection and processing of correspondence for mailing with the United States Postal Service, said practice being that in the ordinary course of business, correspondence is deposited in the United States Postal Service the same day as it is placed for collection.

☐   **(BY OVERNIGHT MAIL)** By placing such document(s) in a sealed envelope, for collection and overnight mailing at Manatt, Phelps & Phillips, LLP, Los Angeles, California following ordinary business practice. I am readily familiar with the practice at Manatt, Phelps & Phillips, LLP for collection and processing of overnight service mailing, said practice being that in the ordinary course of business, correspondence is deposited with the overnight messenger service, _____, for delivery as addressed.

☐   **(BY PERSONAL SERVICE)** By causing such document(s) to be delivered by hand, as addressed by delivering same to_____ with instructions that it be personally served.

MANATT, PHELPS &<br>PHILLIPS, LLP<br>ATTORNEYS AT LAW<br>LOS ANGELES

300214412.1

PROOF OF SERVICE

☐ **(BY FACSIMILE)** By transmitting (or causing to be transmitted) such document(s) by use of facsimile machine telephone number (310) 312-4224 at _____ [time] to the parties at the facsimile numbers listed on the service list above. The facsimile machine used complies with California Rules of Court, Rule 2003(3). The transmission was reported as complete and no error was reported by the machine. I caused the transmitting machine to print a record of the transmission, a copy of which is attached to this declaration.

☐ **(BY ELECTRONIC MAIL)** By transmitting such document(s) electronically at [time] from my e-mail address, tauzenne@manatt.com at Manatt, Phelps & Phillips, LLP, Los Angeles, California, to the person(s) at the electronic mail addresses listed above. The transmission was reported as complete and without error.

☐ **(BY PUC E-MAIL SERVICE)** By transmitting such document(s) electronically from Manatt, Phelps & Phillips, LLP, Los Angeles, California, to the electronic mail addresses listed above. I am readily familiar with the practices of Manatt, Phelps & Phillips, LLP for transmitting documents by electronic mail, said practice being that in the ordinary course of business, such electronic mail is transmitted immediately after such document has been tendered for filing. Said practice also complies with Rule 2.3(b) of the Public Utilities Commission of the State of California and all protocols described therein.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on February 16, 2011, at Los Angeles, California.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

_Terrie Auzenne_
_____
Terrie Auzenne

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

300215713.1

2

PROOF OF SERVICE

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Christina A. Snyder and the assigned discovery Magistrate Judge is Margaret A. Nagle.

The case number on all documents filed with the Court should read as follows:

## CV11- 1434 CAS (MANx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] **Western Division** | [ ] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)      NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
F. BETH GASNER, on Behalf of Herself and All Others Similarly Situated,

**DEFENDANTS**
YOUR BABY CAN, LLC, ROBERT TITZER, Ph.D., and DOES 1-100,

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Rachel L. Jensen (SBN 211456)
ROBBINS GELLER RUDMAN & DOWN LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058

**Attorneys** (If Known)
Brad W. Seiling (SBN 143515); Chad S. Hummel (SBN 139055)
Erin C. Witkow (SBN 216994)
MANATT, PHELPS & PHILLIPS, LLP
11355 West Olympic Blvd.
Los Angeles, CA 90064
Telephone: (310) 312-4000

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☐ 1 Original Proceeding
☒ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify):
☐ 6 Multi-District Litigation
☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)
**CLASS ACTION under F.R.C.P. 23:** ☒ Yes ☐ No   ☐ **MONEY DEMANDED IN COMPLAINT: $** Amount Not Specified

**VI. CAUSE OF ACTION** (Cite the U. S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Diversity of Citizenship under Class Action Fairness Act, 28 U.S.C. 1332(d) and 28 U.S.C. § 1453. Putative class action lawsuit asserting claims for unfair competition, false advertising, violation of Consumer Legal Remedies Act, breach of contract, negligent misrepresentation, and unjust enrichment.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 22 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco- mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☒ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | **SOCIAL SECURITY** |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities – Employment | ☐ 630 Liquor Laws | ☐ 61 HIA(1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | **IMMIGRATION** | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities – Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW 405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus- Alien Detainee | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | **FEDERAL TAX SUITS** |
| | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:** Case Number: CV11-01434

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)
300213195.1

CIVIL COVER SHEET

Page 1 of 2

American LegalNet, Inc.
www.FormsWorkflow.com

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ No ☐ Yes

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No ☒ Yes

If yes, list case number(s): 2:10-cv-09989-DSF-FFM; 2:11-cv-00027-DSF-FFM

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply) ☒ A. Arise from the same or closely related transactions, happenings, or events; or

☒ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☒ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | New York |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | San Diego County |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | Plaintiffs seek to certify a nationwide class |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): _[signature]_ Date February 16, 2011

Erin C. Witkow

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3 -1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

American LegalNet, Inc.
www.FormsWorkflow.com